HONORABLE MARSHA J. PECHMAN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

DUSTIN DEAN,

                              Plaintiff,

vs.

CITY OF TACOMA, TIMOTHY
RANKINE, and MASYIH FORD,

                              Defendants.

No. 3:21-cv-05822-MJP

DEFENDANT CITY OF TACOMA
AND DEFENDANT OFFICER
FORD'S DISCLOSURE OF
REBUTTAL EXPERT WITNESSES

COME NOW the defendants City of Tacoma and Masyih Ford by and through

their attorney, Michelle N. Yotter, and pursuant to FRCP 26(a)(2) discloses the

following rebuttal expert witness and his rebuttal report in this case:

    1.    Chris M. Nielsen, MA, JD
        Valor Resource Group
        27200 272nd Ave SE, #1
        Ravensdale, WA 98051

Chris Nielsen is a law enforcement expert and is disclosed to rebut the expert

testimony offered by plaintiff's law enforcement expert, James V. Pugel.

DEFENDANT CITY OF TACOMA AND DEFENDANT FORD'S
DISCLOSURE OF REBUTTAL EXPERTS - 1

Tacoma City Attorney
Civil Division
747 Market Street, Room 1120
Tacoma, WA 98402-3767
253-591-5885 / Fax 253-591-5755

Mr. Nielsen's opinion is detailed in the attached report. His education, training, and experience are outlined in his report along with his rate of pay.

DATED July 22, 2024.

CHRISTOPHER D. BACHA City Attorney


By:  /s/Michelle N. Yotter
MICHELLE N. YOTTER
WSBA #49075
Deputy City Attorney
Attorney for Defendant City of Tacoma
and Defendant Ford

Tacoma City Attorney
Civil Division
747 Market Street, Room 1120
Tacoma, WA 98402-3767
253-591-5885 / Fax 253-591-5755

# CERTIFICATE OF SERVICE

I hereby certify that on July 22, 2024, I electronically filed the foregoing with the Clerk of Court using the MC/ECF system which will send notification of such filing to the following:

**Attorney for Plaintiff:**

James Bible
James Bible Law Group
14205 SE 36th Street, Suite 100
Bellevue, WA 98006
James@biblelawgroup.com

Matthew A. Ericksen, Sr.
The Ericksen Firm
708 Holcomb Bridge Road
Norcross, GA 30071
matthew@ericksenfirm.com

**Defendant for Timothy Rankine**

Richard Jolley
Audrey M. Murphy
KEATING, BUCKLIN & MCCORMACK, INC., P.S.
801 2nd Ave #1210,
Seattle, WA 98104
rjolley@kbmlawyers.com
amurphy@kbmlawyers.com

DATED this 22nd day of July at Tacoma Washington.

/s/Britt Pittman
Britt Pittman, Paralegal
Tacoma City Attorney's Office
747 Market Street, Suite 1120
Tacoma, WA 98402
(253) 591-5268
bpittman@cityoftacoma.org

DEFENDANT CITY OF TACOMA AND DEFENDANT FORD'S
DISCLOSURE OF REBUTTAL EXPERTS - 3

Tacoma City Attorney
Civil Division
747 Market Street, Room 1120
Tacoma, WA 98402-3767
253-591-5885 / Fax 253-591-5755

## Rebuttal Report of Chris M. Nielsen
## In the matter of
## Dustin Dean v. The City of Tacoma et al.
## U.S. District Court, Western Dist. of WA - Tacoma
## Case 3:21-cv-05822-MJP

I have reviewed the report and associated materials of Plaintiff's expert witness James V. Pugel at the request of the attorneys for the City of Tacoma. Based on this review, I have identified several areas of concern with the conclusions reached by Mr. Pugel. I have been asked to issue a report in response to the opinions expressed by Mr. Pugel.

My qualifications and materials reviewed are set forth below.

I am currently a commissioned police sergeant in the State of Washington. I have been a law enforcement officer for approximately 13 years. During my career as commissioned police officer, I have held assignments in administration, patrol operations, special operations, investigations and with the Valley Regional SWAT Team (VSWAT). I served on VSWAT for approximately six years before transitioning to a supervisory position in patrol operations and, subsequently, administrative services, where I currently serve. As a police officer I have approximately thirty-one thousand hours of training and operational experience in patrol-level operations, tactics, supervisory and leadership experience.

My educational background is as follows: I have an Associate of Arts degree from Bellevue College, a Bachelor of Arts in psychology from the University of Washington (*cum laude, Phi Beta Kappa*), a Master of Arts degree in political science from the Maxwell School of Citizenship and Public Affairs at Syracuse University and a *Juris Doctor* degree from the Syracuse University College of Law (*cum laude).*

**General Police Experience:** In August 2022 I was selected to serve as the administrative training sergeant at the Renton Police Department. As such, I am the primary supervisor for the entire training cadre serving a department of approximately 135 sworn police officers. As the administrative training sergeant, I monitor policy developments, contemporary training practices, and emerging trends in law enforcement training. I review all training procedures for compliance with policies, procedures, and best practices. In this role, I am a designated subject matter expert in use of force training/defensive tactics, firearms training, crisis intervention, de-escalation, less-lethal training (Taser, baton, chemical irritants, less lethal projectiles/launchers, etc.), patrol tactics (field contacts, investigative detentions, custodial arrests, handcuffing techniques, vehicle extractions, building/structure clearing, etc.), emergency vehicle operation (EVOC), first aid, and criminal procedure, report writing, etc.

I am responsible for the recruitment, hiring, and training of all administrative personnel, new-hire, and lateral police officers. In this role, I coordinate recruiting efforts, background

investigations, polygraph examinations, psychological testing, health screening, basic academy training and field training. I oversee the assignment of all patrol equipment, including uniforms, ballistic protection, firearms/firearm accessories/ammunition, body worn cameras, police radios, "stop sticks," less-lethal equipment (Taser, baton, chemical irritants, 40 mm launchers), etc.

Prior to being selected to the administrative training sergeant position, I was selected for promotion to patrol sergeant and assumed formal supervision of a patrol group commencing in March 2021. In this capacity I supervised an early nightshift patrol unit. My responsibilities included a variety of administrative duties, including evaluating the performance of police officers, drafting and documenting performance evaluations, reviewing training application requests, ensuring compliance with training requirements, managing staffing levels and time management software, managing training requirements, responding to citizen queries and complaints, managing patrol/community outreach efforts, managing equipment needs, implementing administrative directives, and ensuring compliance with statutory, policy and generally accepted procedural and tactical principles in patrol operations.

Prior to being promoted to sergeant, I served approximately four years as the Officer in Charge (OIC) of a special operations proactive enforcement unit. In this capacity I have broad experience supervising police officers tasked with providing operational support to various divisions within an accredited police agency consisting of approximately 135 commissioned law enforcement officers. My responsibilities included reviewing and approving tactical operational plans, reviewing and approving police reports, use of force reports/incidents, vehicle pursuits and general police activities for compliance with statutory, policy, and generally accepted procedural and tactical principles in a special operations domain.

Since 2013 I have been a member of the Renton Police Department's Lethal Force Review Board. In this capacity I review all lethal force incidents involving Renton Police Officers for conformity with constitutional requirements, statutory/case law, department policies and generally accepted procedural and tactical principles. I have attended and successfully completed numerous courses on the study of human performance, perception, and cognition, including Introduction to Human Dynamics and Conflict Resolution (2 days consisting of 16 instructional hours), Force Science Analyst Certification (5 days consisting of 40 instructional hours), and Force Science Advanced Specialist Certification (18 weeks consisting of approximately 300 instructional and clinical hours). This field focuses on human performance in the realm of vision, attention, learning/performance, memory, decision-making, speed/dynamics, and human error as applied to police training, tactics, procedures, and critical incidents.

I have substantial training, experience and familiarity with scientific literature involving human performance under stress, including the many ways in which stress impacts physical performance, physiology, and cognitive processes in human subjects. This training and knowledge augmented my professional experience in police-related matters, including critical incidents where events are volatile, uncertain, ambiguous, and complex. Consequently, I have a

sound theoretical and practical understanding of the complexities of human performance in police operations.

I have training and operational experience in crisis intervention, de-escalation techniques and dealing with subjects in mental crisis and/or under the influence of mind-altering substances. I have personally dealt with numerous individuals in the throes of mental crises and/or under the influence of mind-altering substances. Through these experiences I have utilized trained and novel techniques in resolving many such encounters without the use of force; however, through my experience I know the actions of a given individual oftentimes dictate police response and the eventual resolution of the encounter. Accordingly, I have experience using force after unsuccessful attempts to de-escalate encounters.

I have received regular and ongoing training in principles related to bias-based policing, bias, implicit bias, equity, and inclusion as it relates to contemporary principles in modern policing.

My professional experience includes the response, investigation and arrest of offenders for crimes such as misdemeanor/felony domestic violence crimes, vehicular assault, felony/misdemeanor theft, ID theft, trafficking/possession of stolen property, narcotics possession/trafficking, reckless/negligent driving, DUI, obstructing a law enforcement officer, resisting arrest, indecent exposure, communication with a minor for immoral purposes, commercial sexual abuse of a minor, rape, rape of a child, child molestation, murder, manslaughter, attempted murder, theft of a motor vehicle, possession of a stolen vehicle, felony/misdemeanor malicious mischief, bail jumping, disorderly conduct, residential burglary, robbery, unlawful transit conduct, breach of peace, unlawful use of a building for drug purposes, unlawful possession of a firearm, drive-by shooting, driving while license suspended, money laundering, forgery, criminal trespassing, malicious harassment, harassment, failure to disperse, criminal mistreatment, animal cruelty, attempt to elude a pursuing police vehicle, illegal discharge of a firearm, and myriad offenses included in the Revised Code of Washington.

I have training and operational experience in the operation and use of less-lethal tools such as the X2 and X26 model taser ECW, collapsible/non-collapsible batons, OC spray, CS gas and 37- and 40-mm munitions and less-than-lethal projectiles. I have basic training in physical combat disciplines such as mui thai, Brazilian Jiu Jitsu, traditional boxing, and freestyle/collegiate wresting at the collegiate level. I have training and operational experience in traditional police defensive tactics techniques involving joint manipulations, "pain compliance techniques", weapons defense/retention and edged weapons defense. I have been involved in numerous use of force incidents including taser applications, chemical agents, vehicles, firearms, joint manipulations/pain compliance, and a variety of knee, palm, shin and fist strikes and kicks. I have been slapped, kicked, tackled, spat upon, rammed with a vehicle, and targeted by direct gunfire. As a result of these incidents, I have been admitted to the hospital and sought emergency medical treatment approximately six times during my career. Additionally, I have been tased numerous times in both training and during live operations. I have experienced numerous chemical agent exposures, such as OC and CS gas in both training and operational environments.

I have training and experience in "quarrying" tactics, techniques and procedures in working with police tracking canines. In this capacity I have worked with numerous police canines in training scenarios, including outdoor canine tracks, indoor canine tracks, direct canine applications, vehicle extractions, canine handler assaults, and SWAT applications, among others. I have been contacted numerous times by police canines during these activities.

I have training and operational experience in emergency vehicle operations including vehicle pursuits, PIT techniques and vehicle displacement techniques using marked, unmarked and under cover vehicles. I am familiar with various policies, procedures, laws and regulations related to this topic. Likewise, I am familiar with generally accepted tactics, techniques and principles involving emergency vehicle operation and pursuits. I have been involved in approximately twenty vehicle pursuits including approximately nine involving direct vehicle contact in various forms. Most of my career has involved the use and operation of an unmarked police vehicle.

I have training and operational experience in patrol and SWAT-level high-risk vehicle stops and vehicle extraction techniques for compliant and non-compliant/combative subjects, including high-risk mobile arrest and vehicle window breaching tactics.

I was formerly assigned to a mounted bicycle patrol unit for approximately 6 years. I am an International Police Mountain Bike Association (IPMBA) certified patrol officer. I have training and operational experience in mounted bicycle patrol tactics, including crowd control, investigative, arrest and proactive patrol tactics, techniques and procedures.

I am currently a firearms instructor for the Renton Police Department. In this capacity I receive advanced training and instruction in adult learning models and firearms tactics. I develop lesson plans, review case studies in lethal force incidents, and monitor emerging trends/tactics and generally accepted police practices related to firearms training and use. I instruct police officers with various professional experience in basic/advanced marksmanship, basic/advanced weapons manipulation, basic/advanced tactical movement, firearms maintenance/repair, defensive tactics involving lethal force options and a variety of other subject matter related to firearms, including compliance with statutory, case law, policy and best practices.

During my career I have authored, reviewed, or participated in the drafting and service of approximately three hundred search warrants, including residential, automobile, financial, business records, computers, mobile devices, body cavities and myriad other applications.

**Specialized/SWAT/Tactical Experience:** Between 2015 and 2021 I was assigned to the Valley Regional SWAT team (VSWAT). VSWAT is a regional team consisting of personnel from the cities of Auburn, Des Moines, Federal Way, Kent, Renton, Tukwila, and the Port of Seattle. VSWAT is one of the largest and most active tactical teams in the Pacific Northwest. In my SWAT experience I have been involved in approximately five hundred live operations and I have approximately four thousand seven-hundred hours of training and operational experience.

During this period, I was simultaneously assigned to the Special Operations Division at the Renton Police Department. In this capacity, I was assigned to a proactive street crimes unit with other SWAT and non-SWAT trained officers. My duties included providing tactical, operational, and investigative support for a plainclothes/undercover investigative unit. I have training and operational experience in both uniformed and plain clothes operations, including mobile/static surveillance, high-risk arrest operations, residential warrant service, arrest warrant service, narcotics investigations, property crimes investigations, violent crimes, child crimes, and sex crimes, among others.

I have training and operational experience in short and long-term investigations, including complex operations targeting human trafficking and child sex crimes. During these investigations, I have provided surveillance, tactical, and investigative support for undercover operations targeting the child sex trade. These operations generally involve monitoring various social media platforms and interacting with subjects interested in sexual activities related to children and underage persons. I have experience monitoring electronic communications between adult suspects (usually males) and undercover detectives posing as children or offering sex with children. I have experience with the general terminology and lexicon related to underground/deviant sexual culture, including the child sex trade. I have surveilled, arrested, and conversed with individuals under investigation, under arrest, prosecuted for, and convicted of child sex crimes.

Between 2016 and 2021 I served as an instructor for the Washington State Tactical Officers Association (WSTOA). WSTOA is one of the primary training entities for basic and advanced-level SWAT instruction in Washington State and the Pacific Northwest. Prior to being operational, all SWAT officers are required to attend a 60-hour basic SWAT operator course. WSTOA contracts with the Washington State Criminal Justice Training Commission to provide basic SWAT instruction for tactical officers in the Pacific Northwest. In this role I provided instruction to commissioned police officers in mission planning, basic building clearing techniques, mechanical breaching, officer rescue, high-risk vehicle arrest tactics, chemical munitions, less-lethal options, immediate action drills, tactical fitness and a variety of other topics related to special operations/SWAT.

I am a Washington State certified explosives handler. I have training and operational experience in high-energy/explosive breaching. In this capacity I plan the deployment and use of explosive compounds designed to gain access to a variety of structures and otherwise provide vantage points for tactical operations.

I am a certified instructor by the National Tactical Officer's Association (NTOA) in law enforcement active shooter response and chemical/less lethal munitions. Additionally, I am an NTOA certified instructor in active shooter response for non-government organizations (NGOs) and a counter-terrorism response tactics instructor for south King County metro agencies. In these roles, I instruct police officers from various agencies across the Pacific Northwest in basic SWAT tactics, active shooter response tactics and protocols, counter-terrorism response tactics

and protocols, mission planning and the deployment and use of chemical and less lethal munitions. Further, I instruct various stakeholders in public and private organizations in current practices and techniques in responding to workplace violence/mass-casualty/active shooter events.

I am a certified instructor by the National Tactical Officer's Association (NTOA) in the tactical deployment, physiological/psychological effects, techniques and procedures for less-lethal munitions, chemical munitions and noise flash diversionary devices (NFDDs, commonly known as "flash bangs"). I have instructional, operational and training experience, including numerous exposures to less-lethal tools, chemical munitions and NFDDs.

I have live, operational and instructional experience in a broad range of SWAT tactics including mission planning, basic and advanced building clearing techniques/CQC, hostage rescue, mass casualty/active shooter response, counter-terrorism response, barricaded subject tactics, high-risk search warrant service, high-risk mobile/static vehicle arrest tactics, mass-transit hostage rescue/barricaded subject tactics, dignitary protection, close-cover undercover/informant operations, downed officer/officer rescue, combat first aid, high-risk fugitive recovery/apprehension, mobile/static surveillance techniques, high-energy, mechanical and ballistic breaching, urban and woodland operational techniques, less-lethal and chemical munitions, basic/advanced rifle/pistol tactics, basic/advanced NVG rifle/pistol tactics/techniques and tactical fitness/preparedness.

I have been personally involved in numerous high-risk tactical operations including officer-involved critical incidents/shootings.

**Legal Experience:** I am an attorney currently licensed to practice law in the State of Washington. I have held this credential since October 2005. Prior to becoming a police officer, I was employed by the King County Prosecuting Attorney's Office (KCPAO) as a Deputy Prosecuting Attorney (DPA) in 2003 and again from 2005 – 2011. The KCPAO is the primary felony-level prosecuting entity in King County serving a population of approximately two-million residents. I was assigned as a trial attorney to the juvenile and adult divisions, including assignments to the violent crimes, narcotics, domestic violence, district court, car theft and special operations divisions. In this role I reviewed cases from every municipal police agency in King County in addition to various county agencies within and outside King County, as well as the Washington State Patrol, Washington State Department of Fish and Wildlife and a variety of federal/state task forces. I examined referrals from these agencies for legal sufficiency prior to filing misdemeanor and felony cases in district and superior court, respectively.

I was lead counsel on approximately sixty misdemeanor and felony jury trials ranging from misdemeanor theft to attempted murder. I reviewed cases for filing, conducted plea negotiations, reviewed search warrants for legal sufficiency, drafted and argued trial and appellate motions and participated in every phase of criminal prosecution from the investigative stage through final appeal and disposition.

During my assignment to the car theft unit and, later, special operations, I was an on-call attorney tasked with providing legal counsel, reviewing, and approving applications for search warrants presented by commissioned police officers and detectives. It is the policy of the KCPAO that all search warrants associated with cases filed within the county shall be reviewed by a DPA prior to being presented to a qualified magistrate. In this capacity I reviewed approximately one-hundred fifty search warrants for residential dwellings, electronic records and media, cell phones, business records, financial records, narcotics, commercial buildings, personal belongings (backpacks, purses, etc.), automobiles, global positioning surveillance and body cavities, etc. The standard of proof for such documents is "probable cause." Accordingly, the KCPAO and the investigating agencies relied on my judgment and guidance to confirm the existence or absence of probable cause in affidavits for search warrants.

From 2009 – 2011 I was assigned to the Eastside Narcotics Taskforce (ENTF) as special counsel tasked with providing legal counsel, guidance, and oversight on mid/high-level narcotics investigations. ENTF was a regional narcotics taskforce consisting of personnel from the cities of Bellevue, Kirkland, Redmond, Mercer Island, the Washington State Patrol and King County. While at ENTF I assisted in the planning, drafting and oversight of numerous narcotics search warrants, applications for body wires and electronic surveillance. I examined these documents for legal sufficiency/probable cause prior to presenting them to a qualified magistrate for review and approval. I facilitated the seizure and forfeiture of real and personal property used, intended to be used or the proceeds of narcotics related activity and other felony crimes. I managed and litigated these cases from the investigation stage through final disposition.

From 2009 to present I have served as Hearing Examiner for various government agencies in Washington State, including the Cities of Bothell and Kent, King County, the Valley Narcotics Enforcement Team (VNET) and the Port of Seattle. A hearing examiner is a quasi-judicial officer tasked with overseeing the legal process associated with, in my case, the seizure and forfeiture of property associated with narcotics trafficking and the commission of felony-level crimes. In this role I am the primary administrative/judicial officer presiding over asset forfeiture proceedings pursuant to RCWs 69.50.505 and 10.105.010. I review pleadings, legal motions and preside over administrative hearings pursuant to Title 34 RCW and Chapter 10-08 of the Washington Administrative Code. The standards of proof in these proceedings are "preponderance of the evidence" and "probable cause." Accordingly, one of my fundamental duties is to review the sufficiency of police investigations and procedures to determine the existence or absence of probable cause.

From 2006 to 2013 I served as an adjunct instructor at the basic police academy at the Washington State Criminal Justice Training Commission. I provided guidance on curriculum, lectured, and administered practical exercises related to courtroom testimony and led discussions and interactive instruction on such topics as direct examination, cross examination, courtroom procedure/decorum, roles/responsibilities of courtroom personnel, strategies for effective testimony, identification and avoidance of common courtroom mistakes, effective report writing, etc.

I have developed and presented continuing legal education (CLE) trainings on the topics of use of force, force encounters, human performance/physiological responses to stress and tactical decision-making under stress on multiple occasions to the King County Prosecutor's Office, the Washington State Association of Prosecuting Attorneys and a variety of government and non-government entities. Additionally, I have lectured and presented on various law enforcement topics and regional and national-level professional conferences.

**Specialty Training Courses**: Background Investigations for Police Applicants; Combat first-aid, Force Science Institute—the study of human performance during high-stress events; WSTOA SWAT Basic Academy, SWAT Team Leader course, NTOA Active Shooter Instructor Course, DARC Counter-terrorism regional response protocols, Glock armor course; Lethal force legal update (ongoing); CIT Intervention—dealing with subjects in mental crisis; Equity, Inclusion and Implicit Bias; Domestic Violence Investigations and Prosecutions (King County 4th and 5th annual DV Symposiums); Mobile/static Surveillance technique; DEA Narcotics interdiction; DOJ National Trial Advocacy Center advanced criminal litigation; NTOA "Train the Trainer" mass casualty/active shooter/workplace violence response; DOJ National Advocacy Center criminal trial attorney curriculum; Seattle PD Undercover School narcotics manufacturing bloc; FBI HRT Advanced Mechanical Breaching; Explosive breaching; Advanced trial techniques for prosecution of domestic violence; Advanced trial techniques for DNA evidence; Electronic surveillance; Presenting forensic evidence; Trial techniques for prosecuting narcotics manufacturing (methamphetamine, "crack" cocaine, LSD, marijuana, ecstasy, etc.); NTOA Less Lethal/Chemical Munitions Instructor Certification; CrossFit Levels 1 and 2 instructor; USPA "A" and "B" licensed skydiver.

All opinions included in the current report are based on my education, training, personal and professional experience and my review of the below listed materials. The facts and data I've based my opinions on are the kinds that experts in my field would reasonably rely on to form opinions about police practices. The opinions included herein are offered on a "more probable than not" basis and are subject to revision, reconsideration and further development pending the disclosure of new materials, facts, witnesses or other information not previously considered at the time of this writing. Discovery is ongoing and materials may be considered after production of this report.

I. **Materials Reviewed**

- File, "Incident Report 1934800008" – Tacoma Police Department report for incident 1934800008.1, including:
    - Report of Tacoma Police Officer Masiyah Ford (DEAN 000211-000217) (7 pages)
    - Report of Tacoma Police Officer Timothy Rankine (DEAN 000218-000220) (3 pages)
    - Tacoma Police Department advisement of rights, Dustin Dean (DEAN 000221) (1 page)
- File, "19UOF-0112" – documents related to use of force review, including:
    - Blue team review documents (19UOF-0112 000001-000004) (4 pages)
    - CAD report (19UOF-0112 000005-000008) (4 pages)
    - Supervisor's use of force review by Tacoma Police Sergeant Kitselman (19UOF-0112 000009-000010) (2 pages)
    - Complaint and use of force history – Masiyah Ford (19UOF-0112 000011-000012) (2 pages)
    - Report of Tacoma Police Officer Masiyah Ford (19UOF-0112 000013-000019) (7 pages)
    - Report of Tacoma Police Officer Timothy Rankine (19UOF-0112 000020-000022) (3 pages)
- File, "TFD Incident Report X1934800055" – Tacoma Fire Department incident report (DEAN 000923) (1 page)
- File, "Video (Exhibit to Vanessa's Affidavit)(1)" – camera phone video depicting Officers Ford and Rankine arresting Mr. Dean (3:43)
- File, "Complaint" – civil complaint, U.S. District Court – Western District of Washington – Tacoma; case 3:21-cv-05822-MJP, Dean v. City of Tacoma, et al. (13 pages)
- File, "Answer-COT" – answer to complaint, City of Tacoma and Tacoma Police Officer Masiyah Ford (16 pages)
- File, "Expert Report by Paynter_09.14.2022" – report by defense expert witness Thomas Paynter (39 pages)
- File, "DEAN 001940 Training Directive 18-332" – Tacoma Police Department Training Directive, Force Science Use of Force training, Officers Ryan Bradley and Aaron McNeely (DEAN 001940) (1 page)
- File, "DEAN 001941 Training Directive 18-424" – Tacoma Police Department Training Directive, Use of Force Policy Review, all commissioned personnel (DEAN 001941) (1 page)
- File, "DEAN 001942 Training Directive 19-107" – Tacoma Police Department Training Directive, Sergeant Jon Verone and Ryan Koskovich (DEAN 001942) (1 page)
- File, "DEAN 001943-001980 Use of Force Annual Review 2018_binder" – Tacoma Police Department Lesson Plan, active shooter training (DEAN 001943-001980) (38 pages)
- File, "DEAN 001981-002023 PIT Training_binder" – Tacoma Police Department Lesson Plan and related training materials, PIT training (DEAN 001981-002023) (43 pages)

- File, "DEAN 002024-002054 LELU00008 On-Line Legal Update Training_binder" – Tacoma Police Department Lesson Plan and related training materials, 2018 legislative update (DEAN 002024-002054) (31 pages)
- File, "DEAN 002062 ECT 100 Level_2018 ECT Roster 3-1-18" – Tacoma Police Department Training Attendance Roster, taser certification (DEAN 002062) (1 page)
- File, "DEAN 002064-002187 ECT 200 Level_2017 ECT Training_binder & video" – Tacoma Police Department training materials, Taser recertification (DEAN 002064-002187) (124 pages)
- File, "DEAN 002187 liveleakcom - miami beach fatal shooting (longer version)" – video, shirtless man being tased (2:08)
- File, "DEAN 002188-002232 ECT 200 Level_2018 ECT Training_binder" – Tacoma Police Department Lesson Plan and related training materials, taser training (DEAN 02188-002232) (45 pages)
- File, "DEAN 002233-002274 ECT 200 Level_2019 ECT Training_binder" – Tacoma Police Department training materials, Taser recertification (002233-002274) (42 pages)
- File, "DEAN 002344-002438 (CTCS0003) Use of Force Core Principals_binder" – Washington State Cities Insurance Authority training materials, use of force (DEAN 002344-002438) (95 pages)
- File, "DEAN 002439-002487 (LELE0009) 2018 Fall Legal Update Trng_binder" – Tacoma Police Department Lesson Plan and related training materials, legal update (DEAN 002439-002487) (49 pages)
- File, "DEAN 002488-002593 (LELU0010) 2019 Legal Update Turnout Training-binder & video" – Tacoma Police Department Lesson Plan and related training materials, legal update, domestic violence and other topics (002488-002593) (106 pages)
- File, "DEAN 002593 Spring 2019 Legal Update Training" – video presentation of training (1:17:27)
- File, "DEAN 002594-002621 40mm Less Lethal Launcher 2019" – Tacoma Police Department training rosters, less lethal 40 mm (DEAN 002594-002621) (28 pages)
- File, "DEAN 002622-002623 2018 In-Svc Control Tactics Inst Trng (CTIN0006)_binder" – Tacoma Police Department Training Directive, control tactics training cadre (DEAN 002622-002623) (2 pages)
- File, "DEAN 002624-002761 2018 UOF VehOps_binder" – Tacoma Police Department Lesson Plan and related training materials, EVOC, PIT, etc. (DEAN 002624-002761) (168 pages)
- File, "DEAN 002762-004279 Post Academy 2019_binder & videos" – post academy training, use of force, lethal force, firearms (DEAN 002762-004279) (1518 pages)
- File, "DEAN 004280-004673 TPD Pre-Academy 40 Hr Class_binder" – pre-academy training, firearms (DEAN 004280-004673) (394 pages)
- File, "DEAN 004674-004925 Range Training 2018_binder" – Tacoma Police Department Lesson Plan and related training materials, firearms training (DEAN 004674-004925) (252 pages)

- File, "DEAN 004926-005298 Range Training 2019_binder" – Tacoma Police Department Lesson Plan and related training materials, firearms training (DEAN 004926-005298) (373 pages)
- File, "DEAN 005299-005421 Chemical Agents (CTOC)_OCSI-1-Fstudent manual2018" – training materials, OC spray (DEAN 005299-005421) (123 pages)

Statutes, case law, administrative codes

- <u>Tennessee v. Garner</u>, 471 U.S. 1 (1985)
- <u>Graham v. Connor</u> 490 U.S. 386 (1989)
- <u>Georgia v. Randolph</u>, 547 U.S. 103 (2006)
- RCW 9A.16.010
- RCW 9A.16.020
- RCW 9A.76.020 – Obstruction
- WPIC 120.01 – Obstructing a Law Enforcement Officer—Definition
- WPIC 120.02 – Obstructing a Law Enforcement Officer—Elements
- California Penal Code, § 835(a)(4).

Other materials

- *Washington State Domestic Violence Student Handbook*, training materials from the Washington State Criminal Justice Training Commission Basic Law Enforcement Academy (7/14/14)
- Domestic Violence Statistics excerpted from *Covering Domestic Violence: A Guide for Journalists and Other Media Professionals*, training materials from the Washington State Criminal Justice Training Commission Basic Law Enforcement Academy
- Sampson, R, *Domestic Violence*, publication by the U.S. Department of Justice Community Oriented Policing Services (January 2007)
- *Domestic Violence Facilitator Guide*, training materials from the Washington State Criminal Justice Training Commission Basic Law Enforcement Academy (12/2015)
- *Snohomish County to pay $1M in lawsuit over domestic-violence slaying*, article from *The Seattle Times* included in training materials from the Washington State Criminal Justice Training Commission Basic Law Enforcement Academy

## II.  **Facts**

At approximately 12:08 a.m. on  Saturday, December 14, 2019, Johan Wippich called 911 to report loud arguing between a male and female in the parking lot of his apartment complex. According to police dispatch records, Mr. Wippich reported that a male and female associated with a red sedan were arguing and a female was yelling for help.[1] Approximately twenty-two seconds later, Tacoma Police Officers Masiyah Ford and Timothy Rankine were dispatched to the call. Officers Ford and Rankine were operating as a two-person unit together in a single patrol car.

As Officers Ford and Rankine were driving to the call, Mr. Wippich reported that the couple had exited the vehicle and were walking south through the parking lot to an unknown unit.

Eight minutes later, Bryn Perkins called 911 to report loud arguing between a male and female from within an apartment at the same complex reported by Mr. Wippich. The two 911 callers are apparently unrelated to one another. Ms. Perkins further reported that the unit from which the arguing was heard was apparently associated with prior police and/or bail bondsperson responses.

Officers Ford and Rankine arrived at approximately 12:15:48 a.m. They were eventually able to determine the disturbance was occurring in an apartment inhabited by Dustin Dean, his girlfriend Vanessa Henriquez Ray, and Ms. Ray's unidentified daughter. According to Officer Ford:

> When we arrived, we began searching the apartment complex for where the disturbance was coming from. We were on the north side of the complex and we heard a female screaming from the south side of the complex, she appeared to be in distress. We identified that the disturbance was coming from 4310 S. 41st St. unit #29. The neighbor (also a reporting party, who resides in #30) let us into the building and advised that the subjects that live in unit #29 have been engaged in an altercation for the last twenty minutes. The neighbor advised that he heard a female screaming for help. While on the bottom floor of the apartment, I heard a female voice yelling from the top floor for someone to "stop", "leave me alone" "get away from me." I could hear shuffling coming from the unit. We went upstairs and the disturbance got louder and was clearly coming from unit #29.
>
> I could hear things being thrown around in the apartment and a female voice yelling for someone to get away from her and leave her alone. It appeared that a female subject (later identified as

---

[1] See CAD report entry at 00:08:24, DEAN 000207.

> O/HENRIQUEZ, VANESSA) was in distress and immediate police intervention was necessary.[2]

According to Officer Rankine:

> As we were walking up to building 4310, we heard what sounded like a female yelling and screaming for help. The female sounded like she was in distress and needed help. Once inside the building, I heard the female scream "stop it, please stop"… At the door, I observed the door was partially open, and I heard clearly the voice of a female screaming for help.[3]

As Officer Rankine knocked on the door, it swung open. Officer Rankine observed that the light in the entryway was on; however, the interior of the apartment was dark. The interior of the apartment was illuminated only by the light at the entryway. Officer Rankine reported that the officers called out, "Tacoma Police Department" approximately three times and instructed the residents to come out with their hands up.

Mr. Dean emerged from within the department. Officer Ford later noted that Mr. Dean was approximately 6'1" tall and weighed approximately 260 pounds.[4] Both officers noted he was immediately confrontational. Officer Rankine reported that Mr. Dean's arms were crossed in front of his chest, with his hands hidden from view. At this point, both officers had drawn their firearms and held them in a "high ready" position. Officer Rankine instructed Mr. Dean to show his hands; however, Mr. Dean refused. The officers made several more orders instructing Mr. Dean to show his hands and he continued to refuse. In response, Mr. Dean moved his hands behind his back, still out of the officers' view.

Mr. Dean repeatedly asserted the officers had no right or authority to talk to him. According to Officer Ford:

> A/DEAN, DUSTIN PARNELL approached the door. I observed that his hands were red, his fists were clinched. We asked him to step outside and speak with us, he said that we did not have the authority to speak with him. He demanded to know what crime he was being investigated for, I advised him that we were there investigating a possible domestic disturbance. When A/DEAN got to the threshold of the door, he took a bladed stance. I know from my training and experience he was displaying threat indicators. A/DEAN advanced towards us maintaining his aggressive stance and his fists were still clinched. He was looking at me with a 'thousand-yard-stare" and he

---

[2] Report of Tacoma Police Officer Masiyah Ford at DEAN 000215.
[3] Report of Tacoma Police Officer Timothy Rankine at DEAN 000219.
[4] Report of Officer Ford at DEAN 000212.

was grunting loudly, it appeared that he was preparing for a fight. I feared that an assault was imminent.

We ordered A/DEAN to place his hand behind his back and advised him that he was being detained. A/DEAN became irate and began yelling at us. He then stepped outside of the door. I took ahold of A/DEAN'S right arm and attempted to force his arm into the handcuffing positon. (sic) A/DEAN attempted to bring his arm close to his chest and actively resisted our attempt to detain him. He continually demanded to know why he was being detained. We advised A/DEAN several times that we were investigating an incident of possible domestic violence and had the legal authority to detain him and figure out what happed (sic).[5]

Officer Rankine later reported:

As we continued to issue out verbal commands, I observed A/DEAN to be non-compliant as he debated with us over laws. A/DEAN stated we have no right to speak with him. A/DEAN finally made his hands visible as they were balled up into a fist by his side. A/DEAN took up a bladed stance and had a blank stare. A/DEAN's demeanor was aggressive and non-compliant. A/DEAN moved/ rushed towards us and the doorway in an aggressive/ assaultive manner, demanding answers from us. Once out of the doorway into the stairwell I conducted a control hold on A/DEAN's left arm instructing him to place his arms behind his back for the purpose of detaining him for investigation purposes.

A/DEAN pulled away from my arm hold and began to actively resist us. We continued to instruct A/DEAN to place his hand behind his back so that we may detain him to investigate the welfare of the other residents in the apartment. Due to A/DEAN physically resisting us, A/DEAN was taken to the ground where he continued to fight our control and attempts to detain him. PPO Ford informed dispatched we were "fighting with one" as other TPD units were enroute to assist us. We continued to wrestle with A/DEAN to gain his arms to be able to handcuff him. A/DEAN continued to actively resist pulling/shoving us as we attempted to place him in handcuffs. A/DEAN yelled, "You have no rights to detain me or contact me".

---

[5] Report of Officer Ford at DEAN 000216.

We eventually were able to prone him out and place handcuffs on him at the next landing down stairs from the apartments.

While PPO Ford and I were trying to restrain A/DEAN, O1/HENRIQUEZ, VANESSA and her daughter attempted to pull me away from A/DEAN. I had to physically push them back numerous time and instructed them to stay back. PPO Ford had to draw his Taser to get O1/HENRIQUEZ, VANESSA and her daughter to stay away from us.[6]

Officer ford described this period of the interaction as follows:

I called out fighting with one at approximately 00:28 hours. A/DEAN refused to put his hands behind his back. We were fighting on the top of the landing and I feared that A/DEAN would throw me down the stairs. He was very large and incredibly strong. I grabbed A/DEAN by his ponytail and forced his head down to the ground. He actively resisted my efforts to keep him on the ground and attempted to get up. I went down the stairs and then pulled him down the stairs by his right leg. I then grabbed him by his ponytail and again forced his head to the ground, I then pulled him down the stairs. It appeared that A/DEAN became tired because he then began to follow orders to place his hands behind his back. He was breathing heavily and appeared to have run out of energy. At approximately 0031 hours, I advised over the radio that we had one detained.

It should be noted that O/ HENRIQUEZ, VANESSA and her unidentified daughter were screaming at us throughout the altercation. At several points O/HENRIQUEZ and her daughter attempt to grab us and push us away from A/DEAN. I drew my taser, armed the device, and directed O/HENRIQUEZ to step away or be tased. I ordered them to step away and not to interfere, they complied. They continued to yell at us and O/HENRIQUEZ told A/DEAN to cooperate.[7]

While the officers were struggling to detain Mr. Dean, Ms. Ray began video recording the interaction. The video opens with Mr. Dean lying on the stairs with Officer Rankine straddling his hips. A female – presumably Ms. Ray's daughter, is shouting, "You guys need to give him a reason!" A second female – presumably Ms. Ray, is shrieking in the background. Officer Rankine repeatedly orders the female to "Stay inside!" The females continue to shout at the officers. Mr.

[6] Report of Officer Rankine at DEAN 000219-000220.
[7] Report of Officer Ford at DEAN 000216.

Dean shouts, "I didn't do nothing!" and "Let me go!" The scene is very dynamic and tense. Ms. Ray's daughter shouts, "You have no fucking reason…" while Mr. Dean repeatedly shouts for the officers to call their supervisor.

At this point, Mr. Dean has grasped the stair railing with both hands while the officers attempt to detain him. The image at right is a screen capture from Ms. Ray's video depicting Mr. Dean grasping the stair railing.[8]



As the struggle continues, Officer Rankine continuously tells Ms. Ray and her daughter to go back inside. At one point Mr. Dean shouts, "No, Fuck you! Don't listen to them! Do not listen to them! You're illegally detaining me! You're illegally detaining me!" Mr. Dean apparently begins to fatigue and the officers are eventually able to place him in handcuffs.

The video continues for approximately ninety seconds longer, during which time Mr. Dean and Ms. Ray's daughter demand the officers' names and badge numbers. Officer Ford replies that they will provide them, "in a minute" and Ms. Ray's daughter replies, "No! I want them now!" The video ends with Mr. Dean shouting for Ms. Ray to call 911.

The officers noticed Mr. Dean's lip was bleeding slightly. The offices summoned medical personnel to the scene who evaluated Mr. Dean; however, he continued to be belligerent and uncooperative.

Tacoma Sergeant Todd Kitselman responded to the scene. According to Sergeant Kitselman,

> Upon arrival, I contacted PPO Rankine and PPO Ford on the stairwell landing between the second and third floor outside of apartment #29. Seated on the landing in wrist restraints between PPO Ford and PPO Rankine was a large heavy set w/m, later identified as A/ Dean, that was screaming obscenities at both officers. I noted he was out of breath and sweaty and had to pause between bursts of obscenities to catch his breath. I checked with both officers to determine if they or A/ Dean had been injured during the incident. Both officers stated they were uninjured. A/ Dean refused to answer my repeated inquiries to determine if he was in any way injured. He responded to each inquiry with more obscenities. I did not observe any visible injuries on his person.[9]

---

[8] Ray video at :46 elapsed time.
[9] Report of Tacoma Police Sergeant Todd Kitselman at 19UOF-0112 000009.

Mr. Dean was arrested for obstructing a public servant. The charge was later dismissed by for unknown reasons.

<h3 align="center">III.    <strong><u>Introduction</u></strong></h3>

Expert testimony is intended to provide the trier of fact specialized insight into issues and events unfamiliar to the layperson. Both the rules of evidence and rules of procedure dictate that, in addition to opinion testimony, the expert must also disclose the *bases* for the opinion(s). Federal Rule of Civil Procedure Rule 26 (2) dictates that expert testimony must include "a complete statement of all opinions the witness will express and the *basis and reasons for them* [and] the facts or data considered by the witness in forming them…".[10] Evidence Rule 702 provides, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the testimony is based on sufficient facts or data [and] *the testimony is the product of reliable principles and methods* [and] the expert has *reliably applied the principles and methods to the facts of the case*".[11] The use of expert testimony "recognizes that an expert on the stand may give a dissertation or exposition of scientific or other principles relevant to the case, leaving the trier of fact to apply them to the facts."[12] Thus, it is incumbent on the expert to articulate the *reasons* underlying the opinions. It is not enough to simply opine, "The defendant's conduct was deficient because I say so."

<h3 align="center">IV.    <strong><u>Rebuttal</u></strong></h3>

### A. Methodology

The generally accepted methodology in reviewing and analyzing police conduct begins with a comprehensive review of the record associated with the event. Such records may include reports authored by involved police officers, reports authored by witness officers, civilian witness statements, reports authored by investigators, digital evidence (e.g. body-worn camera footage, surveillance footage, phone camera footage, 911 call recordings, radio traffic, photographs, etc.), depositions, internal agency review records, and similar materials. This review provides a general understanding of the event and a factual basis for subsequent evaluation. With a general understanding of the event, the reviewer may then examine relevant statutes, applicable case law, administrative codes, department policies, model policies, training materials, personnel records, published literature, etc. These materials often substantiate and provide the empirical basis for determining generally accepted practices in the field.

It is important to note that customs and practices may vary between regions of the United States, communities within these regions, and police agencies within these communities. This is a function of many considerations, including geography, demographics, economic conditions, political environments, and community values, among others. Police agencies – like many government entities – face a multitude of budgetary constraints, personnel limitations, staffing

---

[10] FRCP 26 (emphasis added).
[11] Fed. R. Evid. 702.
[12] Note to Fed. R. Evid. 702.

concerns, and political currents that necessarily impact practices. It is also important to note that the volatile, uncertain, complex, and ambiguous nature of policework does not lend itself to universal, standardized practices for every situation a police officer may encounter. Accordingly, police agency policies are often crafted and implemented with these considerations in mind.

Best practices are also considered with these factors in mind. It is important to keep in mind that *optimal* practices are not the same as *generally accepted* or reasonable practices. For example, in a given event it may be *optimal* to use resources such as an aerial unit (e.g. a helicopter, fixed-wing airplane, unmanned drone, etc.), canine, chemical munitions launcher, and/or additional personnel, etc. Likewise, it may be *optimal* to deal with a situation with five officers instead of three. Obviously, the use of these options necessarily requires them to be *available*; however, most police agencies do not have access to aerial units, and many do not have canines, chemical munitions, and/or unlimited personnel on duty. If any of these options are unavailable or otherwise not possible, the police officers on scene are forced to deal with the circumstances in the most *reasonable* manner they can. This is precisely why the conduct of police officers is judged by this standard – that is, one of a *reasonable police officer*.

In police practice, the concept of "reasonableness" stems from the holding in the United States Supreme Court case of <u>Graham v. Connor</u> 490 U.S. 386 (1989). The <u>Graham</u> court held that, "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation."[13] Further, "The 'reasonableness' of a particular use of force must be judged *from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.*"[14] The analysis must include the "totality of the circumstances" known to the officer at the time.[15]

This methodology is widely accepted as the standard by which police actions are evaluated. For example, in California,

> [T]he decision by a peace officer to use force shall be evaluated from the perspective of a reasonable officer in the same situation, based on the totality of the circumstances *known to or perceived by the officer at the time, rather than with the benefit of hindsight*, and that the totality of the circumstances shall account for occasions when officers may be forced to make quick judgments about using force.[16]

---

[13] <u>Graham</u> at 397.
[14] <u>Graham</u> at 396, emphasis added.
[15] Id.
[16] California Penal Code, § 835(a)(4).

Here, Mr. Pugel opines as follows:

> It is my understanding that Mr. Dean and Ms. Ray believe that the officers' actions were inappropriate based on several key facts:
>
> • The door to the apartment was closed.
>
> • No DV or other crime had occurred that evening.
>
> • Ms. Ray was not yelling "help" or anything else that would give someone the impression that someone was in danger.
>
> • The officers obviously did not have a search warrant and there were no exigent circumstances justifying their unauthorized entry into the apartment.
>
> • The officers did not announce their presence when they opened the apartment door.
>
> • The officers made no efforts to talk with Mr. Dean prior to physically restraining him.
>
> • Mr. Dean had no idea why officers had entered his girlfriend's apartment and the officers did not tell him why he was being detained.
>
> Presumably, all of those facts will be disputed by the officers and it would be up to a jury to determine which side has told the truth. However, assuming for the sake of argument that the account of Mr. Dean and Ms. Ray is accurate it is my opinion that the officers did not take the time to investigate the event before they entered and used force.

In opining on the actions of Officers Ford and Rankine, proper question here is not what Mr. Dean and Ms. Ray believed. Nor is it proper to invoke facts unknown to the officers at the time of the event (e.g. "No DV or other crime had occurred that evening").

The proper analysis focuses on the questions 1) whether Officers Ford and Rankine believed there were legal justifications for their actions, 2) If so, whether Officers Ford and Ranine had a reasonable basis/bases for these beliefs, and 3) whether Officers Ford and Rankine's actions were consistent with generally accepted police training principles, practices, and procedures.

B. Police Response Protocols

1. Domestic Violence and Related Safety Concerns

Police officers spend a substantial amount of their time responding to, and investigating, domestic violence crime. Police officers are trained that domestic violence calls constitute up to 50% of 911 calls nationwide.[17] While police officers are trained in a variety of topics, particular attention is given to domestic violence. Police officers are trained to understand the broad impact domestic violence has on the community. "While the consequences of domestic violence to individuals are innumerable, the collective costs to the community are frequently hidden but unending. Domestic violence contributes to the systematic destruction of individuals and the family, the foundations of our society. The community pays a high price in the lost lives, not only of individual family members, but also of others."[18]

Beginning at the basic police academy, police officers are trained that "[d]omestic violence is a pattern of behavior that one person in a relationship uses to gain power and control over their current or former spouse, intimate partner, girl/boyfriend or family/household member. Domestic Violence is a broad category that includes behaviors ranging from seemingly trivial to lethal, inflicted mostly upon women. *Domestic violence (DV) is one of the most prevalent and serious crimes* handled by prosecutors across the country.[19]

Further, Washington State police officers are trained that homicide/suicides comprise a significant portion of domestic violence homicides in Washington State.[20] Likewise, police officers are trained that, in domestic relationships, research as shown, "[t]here is a strong link between threat of bodily injury and actual bodily injury, suggesting that abuser threats should be taken seriously."[21]

Police officers are trained that, "DV offenders are far more violent than the general offender population; *DV convictions are the greatest criminal predictor of future acts, and the greatest predictor of future violent crime.*"[22] Further, police officers are trained to understand the risk to officer safety inherent to domestic violence situations. Police training instructs officers that, oftentimes "[m]any perpetrators injure not only their immediate victims but also those who may be trying to intervene. Family members, police, children, neighbors, shelter workers, employers and others, are often secondary victims of the batterer's violence."[23]

---

[17] *Domestic violence student handbook* at page 15
[18] Id at page 11.
[19] *Prosecutors' Domestic Violence Handbook* at page 5.
[20] See Domestic Violence Statistics , from HANDOUT - Domestic Violence - A Guide for Journalists (2006-00-00) DV"
[21] See Sampson, *Domestic Violence* (2007-05-16) DV at page 14.
[22] *Prosecutors' Domestic Violence Handbook* at page 6-7, emphasis in original.
[23] *Domestic violence student handbook* at page 11.

Police officers are generally expected to use and exercise sound professional discretion; however, officer discretion is limited in domestic violence cases. Police officers in Washington State are trained that:

Normally, officers have discretion (a choice) whether to arrest a suspect or not. In DV situations, whenever an arrest is mandated by law, the responding officer must arrest the suspect. Mandatory and discretionary arrest authority is governed by RCW 10.31, 10.99, and 26.50. RCW 10.31.100(2) states: "A police officer shall arrest and take into custody, pending release on bail, personal recognizance, or court order, a person without a warrant when the officer has probable cause to believe that [a specified domestic violence crime has occurred]." When the RCW says "shall" it means there is no choice.[24]

Because of the mandatory arrest provisions associated with domestic violence, police officers are trained to arrest domestic violence suspects where there is a good-faith basis to do so. Toward this end, police officers are trained to understand they shielded from liability when carrying out the intent of the legislature:

No police officer may be held criminally or civilly liable for making an arrest pursuant to RCW 10.31.100(2) or (10) if the police officer acts in good faith and without malice. RCW 10.99.070 states: "A peace officer shall not be held liable in any civil action for an arrest based on probable cause, enforcement in good faith of a court order, or any other action or omission in good faith under this chapter arising from an alleged incident of domestic violence brought by any party to the incident." RCW 26.50.140 states: "No peace officer may be held criminally or civilly liable for making an arrest under RCW 26.50.110 if the police officer acts in good faith and without malice.[25]

The Washington State Legislature explained: "It is the intent of the legislature that the official response to cases of domestic violence shall stress the enforcement of the laws to protect the victim and shall communicate the attitude that violent behavior is not excused or tolerated."[26] Further, police officers are trained there are two specific legislative goals underlying Washington State's domestic violence laws: 1) victim safety, and 2) batterer accountability.[27] Thus, police are trained to err on the side of victim safety. In fact, police officers are trained to understand they can be held liable for *failing* to make an arrest when investigating domestic violence crimes.[28]

---

[24] Id at page 35.
[25] Id at page 30.
[26] Id ap page 32.
[27] See *Domestic Violence Facilitator Guide* at page 5.
[28] See *Snohomish County to pay $1M in lawsuit over domestic-violence slaying*; Sampson, *Domestic Violence* (2007-05-16) DV at page 33.

2. "Priorities of Work"

In responding to law enforcement crises, police officers are trained to prioritize their efforts to maximize safety and the efficient allocation of resources. This principle is generally known as the *priorities of work*. These priorities are, in respective order: 1) render the scene safe/secure the scene, 2) render medical aid to the injured/triage casualties, 3) investigate crime. Where police respond to a violent event, they are trained to focus primary efforts on the source of the violence. Once the source is identified, they are trained to take reasonable and appropriate measures to isolate it and mitigate harm. Once danger has abated, the attention focuses on treating the injured according to severity of injuries and likelihood of survival. Finally, with the scene secure and injured treated, police will focus on documenting events, interviewing witnesses, collecting evidence, etc.

Securing the scene is the paramount concern. Scene control is the first principle listed in Seattle Police Training as the first step in the "de-escalation model."[29] Medics, mental health professionals and non-law enforcement personnel will not respond to an active, unsecured crime scene. Introducing non-law enforcement personnel into an unsecure scene places them in greater danger and elevates the risk of additional casualties. Thus, police officers are trained to prevent non-law enforcement personnel from entering a scene prior to securing it and making it safe.

3. "Safety Priorities"

When securing a scene, police officers are trained to allocate risk according to those with most control over their fate. This principle is commonly known as the *life safety priorities* or **safety priorities**. Officers are trained to make decisions based on the following priorities in respective order of importance: 1) the safety of innocent/uninvolved citizens, 2) the safety of responding officers, and 3) safety of the offender/source of the conflict. This model allocates risk according to those with most control over their circumstances, "utilizing objective criteria based on an individual's current or likely risk of suffering serious bodily injury or death *and their direct ability to remove themselves from that danger*. Those exposed to the greatest potential of injury with the least ability to escape the situation are placed at the top of the priorities... On the other end of the continuum is the suspect, who has little threat of injury and absolute control over the situation [through his/her ability to surrender and/or cease the dangerous behavior]."[30]

According to this principle, an officer would place him/herself in peril to minimize danger to the public. Officers are not trained to gamble with the lives of citizens or other officers in favor of the suspect. For example, during an active shooter event at a school, injury from gunfire is a likely outcome. Successful law enforcement intervention may not entirely prevent this outcome, but it can likely mitigate it. An appropriately trained officer should enter the school and confront the

---

[29] See file, "SPD 018880-SPD 018923 2016 CIT Training3edit" at SPD 018894.
[30] *Tactical Responses and Operations Standard for Law Enforcement Agencies*, published by the National Tactical Officers Association, April, 2018, emphasis added.

shooter, thereby placing him/herself in greater danger of being shot while reducing the danger of innocent citizens being targeted. The officer may be forced to engage the shooter, increasing the likelihood the shooter is injured while further reducing the likelihood of injury to innocents. These are the "safety priorities" in action.

4. <u>Controlling the Scene</u>

Police officers are trained that they have legal authority to control crime scenes and other situations where they are conducting legitimate law enforcement activity. Police officers are further trained that, where specific articulable concerns for public or officer safety exist, they may move, detain, or otherwise limit a person's freedoms within reason.

Additionally, police officers are trained to predict danger based on articulable observations of a subject's behaviors, which are often manifested in their physical appearance, speech, apparent thought processes, actions, and/or presence of weapons. When interacting with citizens, officers are trained to take immediate protective measures when there is a legitimate concern for the officer's safety.[31] Further, police officers are trained that a "protective frisk" is appropriate where, as here, 1) the initial encounter is lawful, 2) a reasonable safety concern exists to justify the frisk, and 3) the scope of the frisk is limited to the protective purpose.[32]

5. <u>"Reasonable Suspicion"</u>

Officers are further trained in the legal concept of "reasonable suspicion." Reasonable suspicion is a legal principle establishing the minimum legal threshold justifying the detention of a citizen and is fundamental to basic police work. The US Supreme Court established this principle in the case of <u>Terry v. Ohio</u>. The <u>Terry</u> court held that an officer may briefly detain a citizen to investigate criminal activity where the officer(s) can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion."[33] The act of stopping and/or detaining a subject suspected of criminal activity is commonly known as a "Terry Stop." This is a commonly trained legal principle understood by police officers.

Courts have further developed the concept of a <u>Terry</u> detention in subsequent rulings. In Washington State the level of "articulable suspicion," that is, the ability of an investigating officer to observe unusual (i.e. "suspicious") events, contextualize them through his/her training and experience and articulate his/her suspicion of criminal activity, must lead to "a substantial possibility that criminal conduct has occurred or is about to occur."[34] The officer's training,

---

[31] See <u>Seattle v. Hall</u>, 60 Wn. App. 645, 652-53, 806 P.2d 1246 (1991) (officer permitted to frisk citizen who exhibited hostile and nervous behavior after voluntarily approaching officer).
[32] <u>State v. Collins</u>, 121 Wn.2d 168, 173 (Wash. 1993) citing <u>Adams v. Williams</u>, 407 U.S. 143, 146, (1972).
[33] <u>Terry v. Ohio</u>, 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L. Ed.2d 889 (1968)
[34] <u>State v. Kennedy</u>, 107 Wn.2d 1, 6, 726 P.2d 445 (1986)

experience, observations and reasonable inferences therefrom establish the bases upon which a Terry stop may be justified.[35] Police officers are also trained on this principle.

Courts have recognized that officers make errors and sometimes must act on incomplete information and evolving circumstances. Consequently, officers are not required to rule out all possible explanations for observed conduct prior to conducting a Terry stop.[36] Likewise, if it is later discovered the officer was wrong or mistaken, the stop may still be proper if the officer's actions were reasonable.[37] Thus, police officers are widely trained that, given the uncertainty and volatility of policework, they do not always have to be *right*; rather, they must be *reasonable*.

Here, Mr. Pugel opines that, "If what the officers wrote in the report is accurate, then the officers would have had reasonable suspicion that a crime was being committed; possibly some type of domestic violence."[38] I agree with this opinion – there were sufficient facts for Officers Ford and Rankine to conclude there was reasonable suspicion to believe Mr. Dean had committed or was committing a domestic violence assault.

Mr. Pugel further opines, ""…there may have been legal justification by Officers Ford and Rankine to detain Mr. Dean, but *the detention should have been preceded by attempts to engage Mr. Dean or Ms. Ray verbally and make a reasonable attempt to learn what was transpiring*."[39] I agree with Mr. Pugel's opinion that there was a legal basis to detain Mr. Dean; however, I disagree that "*the detention should have been preceded by attempts to engage Mr. Dean or Ms. Ray verbally and make a reasonable attempt to learn what was transpiring*." In reviewing Mr. Pugel's opinions, it is unclear the extent to which he believes his own opinion, as he writes, "Responding officers never know what has actually occurred until they arrive, gather visual and audible information, are able to *stabilize the scene, render it safe and then begin their police investigation.*"[40]

The main priority in police response is securing the scene, *then* attempting to problem solve. It is difficult – at best – to question witnesses, conduct interviews, gather evidence, etc. when there are hostile, intoxicated, unpredictable people present on the scene. This principle is consistent with contemporary training principles related to "de-escalation" and "crisis intervention." The following images depict slides sourced from materials at the Basic Law Enforcement Academy:

---

[35] State v. Glover, 116 Wn.2d 509, 514, 806 P.2d 760 (1991).
[36] State v. Anderson, 51 Wn. App. 775, 780, 755 P.2d 191 (1988)
[37] State v. Seagull, 95 Wn.2d 898, 908, 632 P.2d 44 125 (1981)
[38] Pugel report at page 12.
[39] Pugel report at page 9, emphasis added.
[40] Pugel report at page 9.





6. <u>Exigent Circumstances and the "Emergency Doctrine"</u>

Mr. Pugel opines that, "There are two differing opinions as to whether Mr. Dean was inside of the apartment or if he stepped outside and over the threshold of the apartment into the hallway… Based on the conflicting statement by the officers and Mr. Dean…it is impossible for me to opine as to whether the officers entered the apartment and pulled Mr. Dean out, or if Mr. Dean exited the apartment into the hallway."[41] Based on the information offered by 911 callers and the observations of Officers Ford and Rankine upon arrival, this distinction is immaterial. The officers would be justified in entering Mr. Dean's apartment pursuant to the emergency doctrine.

Beginning at the basic police academy, police officers are trained on the concept of "exigency" and the "emergency doctrine." Police officers are trained that an "exigency" exists where:

**[I]f all of the circumstances known to the officer at the time would cause a reasonable person to believe that entry was necessary to** *prevent physical harm to the officer or other persons or give immediate aid to a person within the area to be searched* **and there was insufficient time to get a search warrant.**[42]

**Police officers are further trained that, "the role of a peace officer includes** *preventing violence* **and restoring order, not simply rendering first aid to casualties…".[43] Likewise, police officers are trained that, "**police officers responding to a domestic violence report *have a duty* to ensure **the present and continued safety and well-being of the occupants" of a home.[44] Finally, police** officers are trained that they have broad authority to protect citizens from domestic violence where, as here, their actions are reasonable:

---

[41] Id.

[42] WPI 342.07.

[43] <u>Brigham City v. Stuart</u>, 547 U.S. 398 (2006) (emphasis added).

[44] <u>State v. Raines</u>, 55 Wn. App. 459 (1989), emphasis added; this case is covered at the Washington State Basic Law Enforcement Academy – See *Facilitator Guide - Exigent Circ & Consent Searches* (12-2015) (emphasis added)

> [There is no question] about the authority of the police to enter a
> dwelling to protect a residence (sic) from domestic violence; so long
> as they have good reason to believe such a threat exists, it would be
> silly to suggest that the police would commit a tort by entering… to
> determine whether violence (or threat of violence) has just occurred
> or is about to (or soon will) occur…[45]

Mr. Pugel's analysis fails to recognize these basic police training and legal principles related to domestic violence. Here, when the officers encountered Mr. Dean, there was a legal basis to detain him. When they noted he was uncooperative, hostile, and belligerent, pursuant to the emergency doctrine, it would not matter under the present circumstances whether he was in the hallway or within the threshold of the doorway.

### C. Use of Force Principles

Police officers are widely trained on topics, tactics, techniques, procedures, and policies related to the use of force. Among other topics, police officers are trained when force is appropriate, the quantity, and what type(s) of force may be proper. Officers are further trained in many legal concepts related to the use of force. Police officers are trained that force is also generally authorized when 1) carrying out a lawful duty **such as a detention or arrest** and 2) in self-defense or defense of others.[46] Officers are also trained on the concept of "necessity" as it applies to force: "'**Necessary**' means that no reasonably effective alternative to the use of force appeared to exist and that the amount of force used was reasonable to effect the lawful purpose intended."[47]

In applying force, officers are trained to tailor force options appropriate to the perceived threat. Officers are not trained to exhaust every lesser force option prior to choosing one most likely to be effective. For example, it would be unreasonable for an officer to use a baton when confronted with a gun, as it would not be a "reasonably effective" alternative to higher degrees of force, such as a firearm.

Officers are also trained to make decisions in tense, uncertain and rapidly evolving circumstances, based on facts as they are understood at the time of the event, without the benefit of hindsight.[48] Further, in making force decisions, **officers are trained to consider the severity of the crime at issue, whether the suspect poses an immediate threat to the community or officers, and the suspect's efforts to resist detention or flee.**[49] These are commonly known as the "Graham

---

[45] <u>Georgia v. Randolph</u>, 547 U.S. 103 (2006); similar principles were also presented to Tacoma Police Department personnel in a spring 2019 department training, which both Officer Ford and Officer Rankine attended (see DEAN 002521, 002560, 002563).

[46] RCW 9A.16.020 (emphasis added).

[47] RCW 9A.16.010.

[48] From <u>Tennessee v. Garner</u>, 471 U.S. 1 (1985); also, widely a topic of police training.

[49] These principles are the result of <u>Graham v. Connor</u>, 490 U.S. 386 (1989) and are widely addressed in police training.

factors" as prescribed in the U.S. Supreme Court case <u>Graham v. Connor</u>. Officers are trained to tailor force options according to such conditions as: whether the suspect's actions pose an imminent threat of harm to the public or responding officers; the number of suspects; the number of officers present; the size, age and physical condition of the suspect vs. officer(s); known or perceived abilities of suspect; availability of or proximity to weapons; prior violent or mental health history known at the time; drug or alcohol impairment; injury to officer(s); and risk associated with a prolonged struggle, among other considerations.

In law enforcement, the terminology and nomenclature related to use of force have evolved over the last decade; however, the general underlying principles remain the same. In general, police officers are trained in force options spanning a spectrum or "continuum" of options. At its lowest level, the spectrum usually begins with mere presence and verbal commands. Traditional notions of "force" usually involve some physical contact between the officer and subject beyond mere presence and verbal directives.

The lowest level of physical force involves the use of grabs, holds, leverage and joint manipulation. These are commonly known as "soft empty hand techniques" and represent the lowest level force options.

The next level of force involves punches, kicks, or other strikes in a "hand-to-hand" manner. This level is commonly known as "hard empty hand techniques." This level of force may also involve the use of impact tools such as a baton, projectile(s) (e.g. "bean bag" or other "kinetic impact projectiles"), chemical irritants (e.g. "OC" or "pepper spray"), and/or conducted energy weapons ("CEWs" commonly known under the brand name, "Taser"). These options fall under the broad category of "less lethal" force options and are sometimes referred to as an "intermediate" level of force.

The highest level of force is broadly known as "lethal force." This level involves the use of firearms or other options involving a high likelihood of serious injury or death. This level of force is not at issue here and will not be addressed further.

As always, police are trained to choose tactics, techniques, and procedures according to the safety priorities discussed above. It is quite common for initial force applications to fail. Police officers are trained to plan contingencies and "transition" between force options until the threat is abated and the situation is stabilized. Likewise, officers are trained to moderate force according to the level of resistance chosen by the suspect. Police are trained to use *proportional* – not *equal* – force. The use of force is designed to overcome resistance, *not merely meet it*. Under this model, police officers are not trained – nor expected – to begin at the "lowest" level of force and work "upward." Rather, they are trained to choose the proper level of force under the circumstances to overcome actual resistance in achieving a lawful objective. For example, if an offender punches a police officer, the police officer is not trained to stand toe-to-toe with the offender on equal footing and trade blows. Doing so increases the risk of injury to the officer and the offender. Rather, police officers are trained to *overcome* resistance as safely as possible. This

may mean, for example, that if an offender punches a police officer, the officer may use greater force options such as impact tools, chemical irritants, or an electronic control device (i.e. Taser) to control the suspect's actions and meet the lawful objective. *Therefore, the suspect's actions and decisions are key factors in the amount of force used by the police.*

Here, Mr. Pugel opines,

> Based on descriptions and after viewing the cell phone video it is my opinion that he was *passive/actively resisting*. This is indicated by the description of Mr. Dean '…bringing his arm close to his chest', instead of being handcuffed. My opinion that Mr. Dean was *passively resisting* is further supported by him holding onto the railing next to the stairs preventing his arms from being placed in a cuffing position.[50]

And,

> It is my opinion, after watching the video of the physical confrontation between Mr. Dean and Officer's Ford and Rankine that it was very low level 'active resistance' and mostly 'passive resistance'.[51]

And,

> If the officers' account is accurate, it is my opinion the officers were allowed to use reasonable force to detain Mr. Dean to determine if a crime had been committed.[52]

I agree with Mr. Pugel's opinions that 1) Mr. Dean was actively resisting and 2) Officers Ford and Rankine had the legal authority to use reasonable force to overcome Mr. Dean's resistance.

1. <u>The Nature of Force Used by Officers Ford and Rankine</u>

The video taken by Ms. Rays depicts Officers Ford and Rankine did not slap, punch, knee, or kick Mr. Dean at any point during the encounter and there have been no claims that the officers struck Mr. Dean. Likewise, the video depicts that the officers did not apply any less-lethal tools (e.g. electronic control weapon/Taser), O.C. spray, baton, impact munitions, etc. to Mr. Dean. There have been no claims that the officers applied any of these tools to Mr. Dean during the encounter. The officers' statements and the video clearly depict the officers using a variety of leverage techniques in efforts to detain Mr. Dean. These techniques are among the lowest levels of force available to overcome the resistance offered by Mr. Dean.

---

[50] Pugel report at page 12.
[51] Id at page 16.
[52] Id at page 18.

a. <u>"Chokehold"</u>

The video depicts one of the arms of one of the officers in transitory contact with Mr. Dean's neck.[53] Within approximately three seconds, the officer uses leverage and momentum to take Mr. Dean to the ground while grasping Mr. Dean's head. Mr. Paynter – the defendants' other expert witness – characterizes this as a "cross face maneuver." I agree with this characterization.

It appears that any contact with Mr. Dean's neck was incidental and/or unintentional. It is further evident that Mr. Dean was noncompliant and belligerent before, during, and after this incidental contact. This indicates to me that he was conscious and his ability to breathe was not impacted. Accordingly, I believe that the totality of force used by Officers Ford and Rankine was appropriate.

D. <u>Investigation</u>

Mr. Pugel opines that Officers "*never took any steps to investigate* and gather physical evidence or witness/victim statements from Ms. Ray (the supposed victim) or Ms. Ray's daughter, who were both at the scene."[54] In reaching this conclusion, Mr. Pugel omits the following passage from Officer Rankine's original report:

> Once A/DEAN was in our patrol vehicle, I contacted O1/HENRIQUEZ, VANESSA and asked her what was going on tonight. O1/HENRIQUEZ, VANESSA stated that she was arguing with A/DEAN over food items at her company dinner party. I asked O1/HENRIQUEZ, VANESSA if they had been drinking tonight and she stated that A/DEAN and herself have been drinking but did not drive home. O1/HENRIQUEZ, VANESSA stated at no point during the verbal argument did anything get physical with A/DEAN. O1/HENRIQUEZ, VANESSA was advised that A/DEAN was being transported to Pierce County Jail for booking. O1/HENRIQUEZ, VANESSA daughter was uncooperative and did not want to provide me with her name. O1/HENRIQUEZ was provided with a DV resource sheets and an incident number.[55]

It is unclear how Mr. Pugel reaches this conclusion considering Officer Rankine's report. Accordingly, I disagree that the officers "never took any steps to investigate" the circumstances. Ms. Ray (Henriquez) and her daughter were both uncooperative with Officer Rankine, which effectively foreclosed any further action on the matter. In my opinion, Officer Rankine's attempts to investigate and the resulting disposition of the call were consistent with generally accepted police practices and procedures.

---

[53] See video at :59 elapsed time.
[54] Pugel report at page 15 (emphasis added)
[55] Report of Officer Rankine at page 3.

E. Use of Force Investigation

Mr. Pugel criticizes Sergeant Kitselman and the Tacoma Police Department for failing to investigate and supervise Officers Ford and Rankine; however, Mr. Pugel omits any reference to Sergeant Kitselman's report documenting the event. According to Sergeant Kitselman:

Seated on the landing in wrist restraints between PPO Ford and PPO Rankine was a large heavy set w/m, later identified as A/ Dean, that was screaming obscenities at both officers. I noted he was out of breath and sweaty and had to pause between bursts of obscenities to catch his breath. I checked with both officers to determine if they or A/ Dean had been injured during the incident. Both officers stated they were uninjured. A/ Dean refused to answer my repeated inquiries to determine if he was in any way injured. He responded to each inquiry with more obscenities. I did not observe any visible injuries on his person.[56]

Internal investigations are governed by each police agency's respective policies. Mr. Pugel draws his conclusions while failing to cite any Tacoma Police Department policy related to internal investigations. Further, Mr. Pugel fails to consider that Sergeant Kitselman responded to the incident, personally interacted with the parties, and was in a position to evaluate the circumstances. The record is clear that, at every turn, Mr. Dean, Ms. Ray, and Ms. Ray's unidentified daughter refused to cooperate with any law enforcement personnel. Mr. Pugel also fails to consider that, based on Sergeant Kitselman's review, there were no credible questions regarding the event.

It is noteworthy that claims of this nature are commonplace. Intoxicated, oppositional, and belligerent parties frequently levy claims against police agencies. In my opinion, Sergeant Kitselman's oversight and supervision of the event were appropriate and consistent with generally accepted police practices and procedures.

---

[56] Report of Sergeant Kitselman at 19UF112 000009.

## V. <u>SUMMARY OF OPINIONS</u>

**The following represents a general summary of opinions in response to the report of plaintiff's expert James V. Pugel. The reader is advised that this is only a summary, and additional opinions may be expressed in the analyses offered above.**

1. **I agree with Mr. Pugel's opinion that, upon contacting Mr. Dean, a reasonable police officer under the same or similar circumstances would believe there was reasonable suspicion to detain Mr. Dean to investigate a domestic violence crime.**

2. **A reasonable police officer under the same or substantially same circumstances would believe there was an immediate need to control the scene by detaining Mr. Dean upon contact due to his behavior, demeanor, and noncompliance. The decision to detain Mr. Dean prior to conducting any further investigation was consistent with generally accepted police training principles, practices, and procedures.**

3. **I agree with Mr. Pugel's opinion that a reasonable police officer under the same or similar circumstances would believe Mr. Dean actively resisted Officers Ford and Rankine's efforts to legally detain him.**

4. **I agree with Mr. Pugel's opinion that a reasonable police officer under the same or similar circumstances would believe the use of reasonable force to overcome Mr. Dean's resistance would be lawful.**

5. **The force used by Officers Ford and Rankine was among the lowest force options available to overcome Mr. Dean's resistance. As such, the force used by Officers Ford and Rankine was consistent with generally accepted police training principles, practices, and procedures.**

6. **The force used to control Mr. Dean did not include a "chokehold."**

7. **Once Mr. Dean was detained and arrested, Officer Rankine took appropriate steps to investigate any criminal acts. Officer Rankine's efforts and the subsequent disposition of these efforts was consistent with generally accepted police training principles, practices, and procedures.**

8. **Sergeant Kitselman's response to the scene, including the supervision of Officers Ford and Rankine, the inquiry into the use of force, and subsequent documentation of the event was consistent with generally accepted police training principles, practices, and procedures.**

## VI.   **PREVIOUS EXPERT TESTIMONY**

1. Usandivaras v. City of Kirkland
   US Dist. Ct. -  Western Dist. of WA - Seattle
   Case 2:18-cv-00889
   Deposition

2. Estate of Regina Annas v. Pierce Co.
   Pierce Co. Superior Court
   Case 18-2-06355-3
   Deposition

3. Estate of Joshua Flores v. City of Centralia
   US Dist. Ct. -  Western Dist. of WA – Tacoma
   Case 3:21-cv-05458-BHS
   Deposition

4. Estate of David Novak, et al., v. City of Spokane
   Spokane County Superior Court
   Case 21-2-00037-32
   Deposition

5. Estate of Jacqueline Salyers, et al., v. City of Tacoma
   US Dist. Ct. -  Western Dist. of WA – Tacoma
   Case C17-5315-BHS
   Deposition

6. Estate of Joseph McDade et al., v. City of Kent
   US Dist. Ct. -  Western Dist. of WA – Seattle
   Case 2:20-cv-00771-BJR
   Deposition

7. Hickman v. City of Fife
   Pierce County Superior Court
   Case 21-2-04956-9
   Deposition

8. Shopbell v. Washington State Department of Fish and Wildlife
   US Dist. Ct. -  Western Dist. of WA – Seattle
   Case 2:18-cv-1758-BJR
   Deposition

9. Bell v. City of Spokane
   US Dist. Ct – Eastern Dist. of WA
   Case 2:20-cv-00051-TOR
   Trial testimony

10. Estate of Pavlovic v. City of Kent
    King County Superior Court
    Case 21-2-13630-0 KNT
    Deposition

11. Provencher v. Pierce Co.
    Pierce County Superior Court
    Case 21-2-05020-6
    Deposition

12. Daybreak v. Landerholm, LLC
    US Dist. Ct. – Western Dist. of WA – Tacoma
    Case 3:18-cv-0521 BHS
    Deposition

13. Estate of Ortega v. Pierce Co.
    Pierce County Superior Court
    Case 17-2-11836-8
    Deposition

14. Estate of Nelson v. Thurston Co.
    U.S. Dist. Ct. - Western Dist. of WA – Tacoma
    Case 3:18-cv-05184 RBL
    Trial testimony

15. Estate of Strickland v. City of Auburn
    U.S. Dist. Ct. – Western Dist. of WA – Seattle
    Case 2:22-cv-00528 JHC

16. State of Washington v. Christopher Burbank et al
    Pierce County Superior Court
    Case 21-1-01286-6
    Deposition/Trial Testimony

17. Gonzalez v. City of Alameda
    U.S. Dist. Ct. – N. Dist. of CA
    Case 4:21-cv-09733-DMR
    Deposition

18. Watkins v. City of Olympia et al.
    U.S. Dist. Ct. – Western Dist. of WA – Tacoma
    Case 3:22-cv-05554-DGE
    Deposition

19. Inquest of David Peppan
    King County Department of Executive Services – Inquest Program
    #18IQ37295
    Deposition

20. Franco Gratton v. City of Tukwila et al.
    U.S. Dist. Ct. – Western Dist. of WA – Seattle
    Case 2:22-cv-01598 TL
    Deposition

21. Estate of Bishop v. City of Buckley et al.
    U.S. Dist. Ct. – Western Dist. of WA – Tacoma
    Case 3:22-cv-05759 BHS
    Deposition

22. Estate of Smith v. City of Seattle
    U.S. Dist. Ct. – Western Dist. of WA – Seattle
    Case 2:22-cv-00609 TSZ
    Deposition

23. Estate of Said Joquin v. City of Lakewood et al.
    Pierce County Superior Court
    Case 21-2-06510-6
    Deposition

24. State of Washington v. Matthew Good
    King County District Court
    Case 223PA5324
    Deposition

25. Estate of Justin Tofte v. City of Longview
    U.S. Dist. Ct. – Western Dist. of WA – Tacoma
    Case 3:22-cv-05700 BHS
    Deposition

## **Compensation**

The billable rate for case review, consultation and report preparation in the current case is $350/hour. Deposition and courtroom testimony are billed at $2,000/day excluding travel time.

_____

Chris M. Nielsen       7/22/2024