# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

_____

DUSTIN DEAN,                      )
                                  )
              Plaintiff,          )
                                  )
        vs.                       ) No. 3:21-cv-05822-MJP
                                  )
CITY OF TACOMA, TIMOTHY           )
RANKINE, and MASYIH FORD,         )
                                  )
              Defendants.         )
                                  )
_____

ZOOM VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION
OF
TIMOTHY RANKINE
_____

1:12 p.m.
Tuesday, January 7, 2025

REBECCA L. MAYSE, CCR
NORTHWEST COURT REPORTERS
20819 72nd Avenue South, Suite 625
Kent, Washington  98032
(206) 623-6136
E-mail:  info@northwestcourtreporters.com

1   Can you give me any kind of description of where --

2   Well, actually, take one step back.  I apologize.

3   Who was driving the police vehicle that night?

4   A   I believe it was Officer Ford that was driving the police

5   vehicle.

6   Q   When ya'll worked as partners was he always the driver or

7   did ya'll switch off?  How did that work?

8   A   We switched off.

9   Q   Can you give me any kind of description of where did you

10  guys park when you arrived at the apartment complex that

11  night?

12  A   If I remember right, we parked on the north side of the

13  apartment.

14  Q   Okay.  And at the time you parked did you know where in the

15  complex you were going?

16  A   We had a general idea of which section of the apartment

17  complex, but we did not know the specific location.

18  Q   What information had you been given about the approximate

19  section of the apartment complex that you'd be responding

20  to?

21  A   With the multiple reporting parties, they had given their

22  location of where they were located.  So off of that

23  information we were able to guess where the location was

24  coming from.

25  Q   Okay.  When you got out of the police vehicle could you hear

1      anything, could you hear any disturbance?

2   A  I think at first we could not hear anything.

3   Q  Okay.  Where did you go after you parked?

4   A  Once we parked we waited in the section that we were in to

5      listen for any sorts of distress.  And then we proceeded

6      south in the apartment.

7   Q  Okay.  So it sounds like you heard something that got your

8      attention.  Do I have that right?

9   A  Yes.

10  Q  What did you hear?

11  A  Muffled screams.

12  Q  Could you make out what someone was saying?

13  A  Not from where we were standing.

14  Q  Okay.  I think you said when you first got out of the car,

15     the police vehicle, you didn't hear a disturbance; is that

16     correct?

17  A  That's correct.

18  Q  Can you give me any kind of estimate of how long you were

19     standing there outside the police vehicle waiting until you

20     heard I think what you described as muffled screaming?

21  A  Not off the top of my head.

22  Q  Okay.  Starting from where you described again you heard

23     some muffled screaming, what happened next?

24  A  Then we proceeded to where we heard the screams coming from,

25     so south of the apartment complex.

1    A    It's a locked door.

2    Q    A locked door.  Thank you.

3         And the reporting party at your request unlocked that?

4    A    Yes.

5    Q    And where did you go from there?

6    A    Then we proceeded up to where we heard all the screams were

7         coming from.  The reporting party followed us up and pointed

8         out the apartment to us.

9         I instructed the reporting party to go back in his

10        apartment and lock the door, and not to open the door until

11        police come to his door.

12   Q    Okay.  And what apartment complex did you go to that you

13        believed the disturbance was coming from?

14   A    I think I already answered this.  I don't know it off of my

15        head.

16   Q    Okay.  As you approached the door to the apartment that you

17        were going to go to, what were you hearing at that point?

18   A    The same screams for help.

19   Q    What happened when you approached the apartment door?

20   A    Well, when we got up to the apartment the apartment door was

21        slightly ajar.  The first thing I did was checked the door

22        handle.  And then we knocked and announced, which is proper

23        police procedure.

24   Q    What do you mean by it was partially ajar?

25   A    The door was not closed, it was open.

1    Q   Okay.  Was it open to a degree that you could see inside the

2       apartment at all?

3    A   No.

4    Q   How many times did you knock on the door?

5    A   That would have to be a guess, but I'm guessing two or three

6       times.

7    Q   Did Ford knock on the door, too, or was it you doing the

8       knocking?

9    A   It was just me.

10   Q   And how did you announce yourself?

11   A   I announced that Tacoma Police was at their door and that

12      they needed to make themselves known in the apartment.

13   Q   And how many times did you make that announcement?

14   A   I think off the top of my head, about three times.

15   Q   Did you hear any kind of response when you made that

16      announcement?

17   A   No.

18   Q   Did Officer Ford make any announcements there at the door?

19   A   I believe he did.

20   Q   Do you recall what he said?

21   A   Not off the top of my head.

22   Q   Okay.  As you're standing there at the apartment door

23      knocking a few times, announcing a couple times, did you

24      hear anything coming from inside the apartment?

25   A   While we're knocking?

1    Q    Okay. So if I understand correctly, you correct me if I
2         misheard you, it sounds like ya'll knocked and announced,
3         then kind of stood back and waited a bit, and then Mr. Dean
4         came to the door and opened it?
5    A    No. The door was already partially opened. When we knocked
6         on the door the door swung open. So now we were just
7         staring into a dark apartment with an open door.
8    Q    Okay. I appreciate that clarification.
9         You said the apartment was dark. Could you see
10        anything inside the apartment?
11   A    I could not. The only way I was able to see anything was
12        with my weapon light.
13   Q    Okay. And when you say your weapon light, what do you mean?
14   A    I -- at that -- when we were waiting to get a response from
15        the apartment I had drawn my service pistol and activated
16        the light to give me a better visual into the immediate area
17        of the apartment.
18   Q    So you had your Glock 17 out?
19   A    Yes.
20   Q    And you were pointing it inside the apartment?
21   A    Yes. Well, it wasn't pointed in the apartment, it was in a
22        high ready position with the light into the apartment. It
23        was pointed towards -- more towards the ground.
24   Q    Okay. Can you describe to me what you mean by "high ready
25        position"?

1   A   When we got up to the apartment the door was ajar.  So the

2       door was not closed at all, it was partially open.  I

3       checked the door handle, as in go up, tap the handle, make

4       sure it's not locked, make sure it's unlocked.  And then we

5       knocked and announced.

6           When we knocked and announced the door swung open

7       because it had really -- previously been partially open.

8       With us knocking on the door, the door swung open.

9   Q   If the door was ajar why would you check to see if it was

10      locked?

11   A   It's always a good practice to check to see if a door is

12      locked or unlocked.

13   Q   Okay.  Tell me what happened from the point where you see a

14      man emerge from the apartment who we know as my client,

15      Dustin.  What happened?

16   A   Well, Dustin appeared -- well, he was in still the very dark

17      apartment.  The only way I was able to see him was using --

18      utilizing my flashlight, or my weapon light.  When he first

19      appeared he had both arms crossed across his chest.  And

20      then he started yelling -- started yelling at us.

21   Q   He started yelling at you before you said anything to him?

22   A   I believe so, yes.

23   Q   And what do you recall him yelling?

24   A   I believe he told us we had no right to talk to him.

25   Q   Did you have a warrant to search that apartment?

1  A  No.

2  Q  Did you have a warrant to arrest anyone in that apartment?

3  A  No.

4  Q  As you made contact with Dustin what, if anything, are you

5     saying to him?

6        ATTORNEY JOLLEY:  Object to the form.

7  A  We are announcing who we are and we're asking him to show us

8     his hands because he's not presenting his hands.

9  Q  And by not presenting his hands, you said his arms were

10    crossed in front of him?

11 A  Yeah, across his chest.

12 Q  And what happened next?

13 A  We kept instructing him to show us his hands.  He kept

14    refusing, saying that we had no right to talk to him.

15 Q  How many times did you give him that instruction?

16 A  I don't know the exact number, but off the top of my head

17    between three to five times.

18 Q  And did he respond to that instruction at all?

19 A  No.

20 Q  At the time when you're giving instruction to Dustin where

21    is he standing?

22 A  Still inside the apartment.

23 Q  And you still have your service weapon out, correct?

24 A  Yes, I do.

25 Q  Where is your Glock pointed?

1    A    Still at the ground.

2    Q    At the ground at Dustin's feet?

3    A    The ground right by the door.

4    Q    Which would be how far from Dustin's feet?

5    A    15 feet.

6    Q    So when you first saw Dustin he was about -- do I have that

7         right, that he was about 15 feet from the threshold of the

8         door?

9    A    Yes.  He was inside the apartment.

10   Q    About 15 feet?

11   A    Approximately, yes.

12   Q    During the initial interaction with Dustin did Officer Ford

13        have his firearm out as well?

14   A    I don't recall that at all, but I don't know off the top of

15        my head.

16   Q    Okay.  So you've given -- your testimony is you've given

17        instructions to Dustin about three or four to five -- three

18        to five times, you haven't gotten any kind of positive

19        response.  What happened next?

20   A    I think --

21             ATTORNEY JOLLEY:  Object to the form.

22   A    Eventually he showed us his hands, but they were balled up

23        in a fist to his side.

24   Q    Okay.  So he balled up his fists and they were down below

25        his waist area?  Do I have that right?

1   A   Right, just to his side of his body.

2   Q   He didn't square up with his hands in front of him like he

3       was going to fight you, did he?

4   A   No, but if you ball your fists up and you put them to your

5       side, that is still deemed a fighting stance.

6   Q   Where was Dustin standing when he, as you say, balled his

7       fists up?

8   A   He was still in the apartment.

9   Q   Had he moved toward the threshold of the door at all?

10  A   Not at this time.

11  Q   So you've used the term "fighting stance."  Why do you use

12      the term "fighting stance"?

13  A   Because natural people don't stand with their fists balled

14      up to their side.

15  Q   Other than what he was doing with his hands, was Dustin

16      doing anything else that would make you think that he was in

17      a fighting stance?

18  A   His stance was blated (phonetic), so his one foot was in

19      front of his other foot.

20  Q   And again, this is all while he's still about 15 feet away

21      from the threshold of the door?

22  A   Yes.

23  Q   Okay.  Where were you taught about a fighting stance?

24  A   The academy.

25  Q   With Dustin having his -- both of his hands at his side you

1     could see both of his hands, right?

2   A   I could.

3   Q   Did Dustin have any weapons in his hands?

4   A   Not that I recall.

5   Q   Was Dustin being aggressive towards you?

6   A   I would say his demeanor was aggressive, yes.

7   Q   And when you say "demeanor," do you mean what you previously

8     described as a fighting stance or do you mean anything else

9     in addition to that?

10  A   Well, part of his demeanor is his fighting stance, but the

11     way he was confronting us, saying we had no right to talk to

12     him, was in a very aggressive tone.

13  Q   Did you tell Dustin why you were there?

14  A   Yes.

15  Q   What did you tell him?

16  A   Said, "We heard a disturbance, we're here to investigate

17     it."

18  Q   During this initial interaction with Dustin that you're

19     describing could you see anyone else inside the apartment?

20  A   No.

21  Q   What happened next?

22  A   After I was able to see his hands, they were balled up to

23     the side of his body, he then moved both his hands behind

24     his back and then he began to come out at us.

25  Q   Could you give me any kind of description of what you mean

40

1     by him putting both of his hands behind his back?

2 A  He tucked both his hands behind his back. I don't know how

3     else to describe it.

4 Q  Like, near his waist area?

5 A  Yeah, kind of near his waist area, like he was either

6     reaching for something or he was trying to hide his hands.

7 Q  Okay. And what happened next?

8 A  Then he rushed out the doorway towards us.

9 Q  Did he run towards you?

10 A  I would say so, yes.

11 Q  Was he saying anything as he ran towards you?

12 A  No.

13 Q  And what happened next?

14 A  Once he rushed out the doorway out towards the landing, me

15     and Officer Ford grabbed ahold of him to put him in a

16     handcuffing position so we could detain him.

17 Q  Where was Dustin standing at the time that you tried to

18     detain him?

19 A  Outside the doorway on the apartment landing.

20 Q  So he was completely 100 percent outside the apartment at

21     the time you put your hands on him?

22 A  Yes.

23 Q  And why were you detaining Dustin at that point?

24 A  Because we still had to investigate what was going on in the

25     apartment and all the screams for help.

1     on his lower back to hold him down?

2 A   I was just using one knee on his back, it wasn't my body

3     weight.

4 Q   Okay. So you were just using part of your body weight?

5     Would that be more accurate to say?

6 A   Yes.

7 Q   What was Officer Ford doing at this time?

8 A   I think between calling out for backup and having to deal

9     with Mr. Dean's girlfriend and daughter, I think that was

10    his main focus.

11 Q  After Mr. Dean was handcuffed and proned out was Officer

12    Ford helping hold him down or putting pressure on him?

13 A   I don't know off the top of my head.

14 Q  During this incident with Dustin were there ever any

15    indications to you that he was having trouble breathing?

16 A   No.

17 Q  Did you use a choke hold on Dustin at any time during this

18    incident?

19 A   No.

20 Q  Did you use any kind of neck restraint on Dustin during this

21    incident?

22 A   No.

23 Q  Okay. So I think we're at part of the story, part of the

24    incident, where Mr. Dean has been proned out, he's been

25    handcuffed, you're using one knee to continue to hold him

1  down.  What happened next?

2  A  Backup units arrive and help secure him.  And then the other

3  units help escort him down to the first floor of the

4  apartment.

5  Q  Okay.  What were you doing at the time?

6  A  I believe I was walking behind him, heading out to the first

7  floor.

8  Q  You were one of the officers who was helping escort him

9  down?

10  A  I was not helping escort.  I was walking behind him.

11  Q  Okay.  It was a different officer who was actually holding

12  him?

13  A  Yes.

14  Q  Okay.  And what happened when ya'll got down to the ground

15  level?

16  A  Once we got down to the ground level my sergeant, Sergeant

17  Kitselman, was there.  I briefed him on what had happened.

18  I think at this time we also noticed that Dean had a minor

19  laceration on his lip, and so we called for Tacoma Fire to

20  come check him out.

21  Q  Did Dustin have that lip laceration before you put your

22  hands on him?

23  A  I couldn't tell you.

24  Q  Do you think that was an injury he suffered during his

25  arrest?

1    A    I couldn't tell you, either.

2    Q    So why did you call medical?

3    A    Because it's good practice if anyone -- if we see a visible

4         injury of any sorts.  Or even if you're involved in an

5         altercation, like a fight, it's always good practice to call

6         Tacoma Fire to check them out in case there's any visible or

7         nonvisible injuries.

8    Q    And in this case Dustin did have a visible injury, correct?

9    A    Correct.

10   Q    And who called Fire?

11   A    It was either me or Officer Ford.  I don't remember off the

12        top of my head.

13   Q    Okay.  How long was your debriefing session with Sergeant

14        Kitselman?

15   A    Off the top of my head, I think it was just a couple

16        minutes.

17   Q    Okay.  And what exactly did you tell him?

18   A    Told him that we responded to a disturbance call at said

19        apartment.  When we got to the door and we knocked and

20        announced Mr. Dean appeared out of the darkness.  And then

21        he rushed us at the door and we were then in a fight with

22        him, trying to restrain him.  And once we were able to

23        restrain him backup units arrived.

24   Q    Do you recall telling Kitselman anything else other than

25        that?

1    I asked her what was the disturbance about, and she refused

2    to saying anything about it.

3  Q  Okay.  Those are the only things you asked her?

4  A  Yes, because she didn't want to talk to us.

5  Q  Okay.  So you didn't ask her if she was okay.

6  A  I tried to ask her that, she didn't respond.  She did not

7    want to talk to me.

8  Q  Did you ask her to give a written statement?

9  A  I don't believe I did.

10  Q  Did you make any effort to talk to the daughter who was also

11    a witness?

12  A  I think we --

13         ATTORNEY JOLLEY:  Object to form.

14  A  I think we attempted to try and talk to the daughter, but

15    the daughter was hiding in the apartment refusing to talk to

16    us.

17  Q  Okay.  And there you're using "we."  So I want to know, did

18    you try to talk to her or do you believe some other officer

19    tried to?

20  A  There was another officer.  I tried to talk to the daughter,

21    but she did not want to talk to us.  But there was another

22    officer at the door asking questions, trying to evaluate if

23    she was okay and wanting to speak to the daughter and her

24    about the incident, but she did not want to talk to us.

25  Q  Who is that other officer?

1    A    I don't remember off the top of my head.

2    Q    Did you ever go back to talk to the reporting party?

3    A    I did not.

4    Q    Did you ever ask them for a written statement about what

5         happened that night?

6    A    I did not personally.

7    Q    Do you know if anyone at TPD ever went back to talk to them?

8    A    I believe so, but I don't know for certain.

9    Q    Is it fair to say you would just be guessing?

10   A    Yes.

11   Q    Okay.  So you described communications or attempted

12        communications with the girlfriend and the daughter.  What

13        happened next?

14   A    After that and when she refused to talk to us, me and

15        Officer Ford placed Mr. Dean in the back of our patrol

16        vehicle and escorted him to Pierce County Jail.

17   Q    Okay.  Did anything happen during the transport?

18   A    During the transport Dean -- Mr. Dean had made some

19        statements to us in between him dozing off and waking up.

20        He made statements stating that he had tons of money in the

21        bank and he was going to sue us.

22   Q    Okay.  Other than that, do you recall anything else about

23        the transport?

24   A    No.

25   Q    And what happened when you brought him to the Pierce County

53

1  Q  Okay.  So you didn't go back patrolling, you went back to
2     the station to write reports?
3  A  We were instructed to, yes.
4  Q  Who instructed you?
5  A  That -- I believe Sergeant Kitselman told us to write a good
6     report about it.
7  Q  Okay.  In your experience was that the normal practice, to
8     go directly from Pierce County Jail to the police department
9     to start writing your report as opposed to going back on
10    duty on patrol?
11  A  It is normal practice for a high stress incident, yes.
12  Q  And that's how you would characterize this incident?
13  A  Fighting with an individual I would categorize as a high
14    stress incident.
15  Q  Okay.  Prior to this incident with Mr. Dean had you ever
16    been involved in any other high stress incidents with TPD?
17  A  Yes.
18  Q  How many?
19  A  I don't know a number off the top of my head.
20  Q  Can you give me any kind of estimate?
21  A  I couldn't.
22  Q  Who made the decision as to what charges, if any, should be
23    brought against Dustin?
24  A  I think it was discussed between me and Officer Ford.
25  Q  And who made that decision?

54

1  A  I don't remember off the top of my head.

2  Q  When did ya'll make that decision?

3  A  I wouldn't know, either.

4  Q  Was it still that night or was it sometime later?

5  A  It was -- I mean, it had to be that night because we have to

6     book him in the jail for it.  So a decision on his charges

7     was made prior to him being booked into jail.

8  Q  Okay.  What, if anything, do you recall about your

9     conversation with Officer Ford about what to do with

10    charges?

11  A  Yeah, I don't recall anything about the conversation.

12  Q  Do you recall what Dustin was charged with?

13  A  Obstruction.

14  Q  Is that a state charge or a city charge?

15  A  I believe --

16         ATTORNEY JOLLEY:  Object to form.

17  A  I believe this was a city charge.

18  Q  Were you and Officer Ford in agreement that that should be

19     the only charge that Dustin should have?

20  A  I believe so.

21  Q  Were you aware that one of the women was taking a cell phone

22     video of the incident while it was happening?

23  A  I was unaware until I saw the video.

24  Q  When did you become aware that there was a video?

25  A  When it was released to the press and it was put out in the

1          THE COURT REPORTER:  Yeah, it still did not come

2     in.

3          "Did you have" something "around his neck?"  I don't

4     know why that word is not coming through.

5          Is anyone else having that issue?

6          ATTORNEY JOLLEY:  It's garbled on our end, yeah.

7          ATTORNEY YOTTER:  Yeah.

8          THE COURT REPORTER:  Thanks.

9          ATTORNEY ERICKSEN:  Okay.  This is one of the

10    reasons why I prefer to do these things in person.

11         ATTORNEY JOLLEY:  Yeah.  And my apologies,

12    Matthew.  That was my doing.

13         ATTORNEY ERICKSEN:  It's no problem, Richard.

14    We'll figure it out.

15         I'll try one more time.  If not I will call back in to

16    see if that makes any difference on the audio quality.  But

17    obviously, you know, I want to make sure that we're all

18    hearing correctly and obviously that the witness can hear

19    the question and I can respond.

20  Q  (By Attorney Ericksen)  So one more time.  At any time

21    during the incident with Dustin did you have an arm around

22    his neck?

23  A  No.

24  Q  At any time during the incident with Dustin did you put any

25    pressure on his neck?

1   A   No.

2   Q   At any time during the incident with Dustin were there any

3       indications to you that he was having trouble breathing?

4   A   No.

5   Q   Okay, sir.  I'm sharing my screen so we can watch this

6       relatively short cell phone video.

7           And again, have you seen this video before?

8   A   Previously I think, yes, once.

9   Q   Wait.  You've seen this video one time?

10  A   Yeah, approximately one time.

11  Q   And that would have been a couple years ago when the media

12      released it?

13  A   I think I reviewed it more recently, but...

14  Q   Okay.

15                      (Cross talk.)

16  A   I don't know if this is the same exact copy as I have, so...

17  Q   Okay.  Well, we're just going to watch it a little bit.

18      Okay?

19      I'm going to hit Play now.  And again, this -- the

20      whole video is only a little bit over three minutes.  So we

21      can watch it.

22                      (Video playing.)

23  Q   (By Attorney Ericksen)  Okay.  I'm pausing at the 22-second

24      mark.

25          On your end, Mr. Rankine, can you hear any audio?

59

```
 1   A   No.
 2   Q   Okay.  Does this look like the video that you've seen
 3       before?
 4   A   It looks like it's been altered and slowed down.
 5   Q   Other than it looking to you like it's been slowed down, is
 6       there any other way that you think it looks like it's been
 7       altered?
 8   A   Besides it being slowed down?  No.
 9   Q   Do you agree with me that at the time this video starts
10       Dustin is already off his feet and you're using force on
11       him?
12   A   Can you repeat the question?
13   Q   Do you agree with me that at the time the video starts
14       Dustin is already off his feet?
15   A   Off his feet?  As in he's not standing?
16   Q   Yes.
17   A   Yes.
18   Q   Do you agree with me at the time this video starts you're
19       already using force on him?
20   A   Yes.
21   Q   Do you agree with me the video does not show what happened
22       at the beginning of the incident?
23   A   Yes.
24   Q   Are you aware of any video or other objective evidence that
25       would tell us what happened prior to the cell phone video
```

1    starting?

2    A    Not to my knowledge.

3    Q    Did either you or Officer Ford have body cams that night?

4    A    No.

5    Q    Was TPD using body cams back in December 2019?

6    A    I do not think so.

7    Q    Were you ever issued a body cam by TPD?

8    A    No.

9    Q    So we previously watched the first 22 seconds.  I'm going to

10        skip ahead.  Or not skip ahead, but I'm playing the video.

11                        (Video playing.)

12   Q    (By Attorney Ericksen)  I'm trying to stop the video at the

13        14-second mark.  Can you see the image here?

14   A    I can.

15   Q    Do you see where your right arm is?

16   A    Not really.

17   Q    Here at the 15-second mark can you see where your right arm

18        is?

19   A    Not where my right arm is.  I can see my left arm.

20   Q    Okay.  Do you see your right hand in this image?

21   A    I think so, yeah.

22   Q    Okay.  And it's around his neck, right?

23   A    It appears that it's around his chest.

24   Q    Okay.  To you at the 15-second mark what you're seeing is

25        your arm around his chest and not his neck?

1          (Pause in proceedings.)

2               THE VIDEOGRAPHER:  We're back on the record.  The

3      time is 3:29.  You may continue.

4  Q   (By Attorney Ericksen)  Mr. Rankine, did you tell my client,

5      "Put your fucking hands behind your fucking back right now"?

6  A   Possibly.  I wouldn't -- yeah.  Saying "right now" wouldn't

7      be something I would say.

8  Q   So you don't think you said that?

9               ATTORNEY JOLLEY:  Object to the form.

10  A   Yeah, I don't think I said that.

11  Q   Do you think Officer Ford said that?

12               ATTORNEY JOLLEY:  Object to the form.

13  A   Not -- yeah, I don't know.  I can't recall who said what.

14  Q   Would use of language like that be of (inaudible) TPD

15      policy?

16  A   Use of what?  What was the question?

17  Q   Would use of language like that be a TPD policy?

18               ATTORNEY JOLLEY:  Object to the form.

19  A   So "use of language like that," like what -- are you

20      referring to what your statement was?

21  Q   Yes.

22  A   Would it be against policy?  Is that what you're --

23  Q   Yes, that's the question.

24  A   I think so.  I don't know off the top of my head.

25  Q   Changing gears, (inaudible) joined the Army?