# EXHIBIT C

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA

_____

DUSTIN DEAN,                    )
                                )
            Plaintiff,          )
                                )
    vs.                         )   No. 3:21-cv-05822-MJP
                                )
CITY OF TACOMA, TIMOTHY         )
RANKINE, and MASYIH FORD,       )
                                )
            Defendants.         )


_____


    Remote Videotaped Deposition Upon Oral Examination

                        of

                  MASYIH FORD
_____


              10:02 a.m.

            January 16, 2025

    Witness Location:  Tacoma, Washington






    Karmen Knudson, RPR, CRR, CCR #1935

1    Q.    Can you give me any kind of estimate of how
2  many total apartments there would be at this apartment
3  complex?
4    A.    No.  I couldn't do that.
5    Q.    Could you say more than 20?  Less than 20?
6  Any kind of estimate?
7    A.    Probably more than 20.
8    Q.    Thinking back to the night of my client's
9  arrest, do you recall where you parked when you arrived
10  at the apartment complex?
11    A.    I believe we went up the -- you have to kind
12  of go up kind of a big hill to get there.  I think we
13  went up and to the right, so that would have been the
14  north side of the apartment complex.
15    Q.    Okay.  So on the north side?
16    A.    Yes.
17    Q.    Had dispatch given you a location in the
18  police -- in the apartment complex that you were
19  supposed to respond to, or at that time did you just
20  know you were going to the apartment complex and --
21    A.    Yes.  They gave us an address, but it
22  appeared to be inaccurate.
23    Q.    And why do you say that?
24    A.    I'm sorry, sir, you cut out.
25    Q.    Oh, I apologize.  Always do that if I cut

1  out.  I appreciate you doing that.

2       I believe your testimony just now was that

3  they gave you an address but it proved to be inaccurate.

4       A.    Yes.

5       Q.    Can you explain what you mean by that.

6       A.    I believe they gave us the wrong address,

7  because we had got to that building and we did not hear

8  anything, a disturbance, coming from that building;

9  however, we could hear a disturbance coming from another

10  building.

11      Q.    Okay.  So at least initially, the dispatch

12  was sending you to a different building, not the

13  building where you ultimately encountered my client?

14      A.    That is correct.

15      Q.    Were you driving that night or was that

16  Officer Rankine driving that night?

17      A.    I believe I was driving that night.

18      Q.    Did you always drive or did you also take

19  turns?  How did that work?

20      A.    We took turns.

21      Q.    Okay.  So I kind of want you to tell me the

22  story a little bit about what happened that night.

23           So at this point, I think we've established

24  you're dispatched to Forest Hill Apartments, it's late

25  at night.  Right?  I don't think we knew -- established

1  an exact time, but it's late at night, you're at Forest

2  Hill Apartments, you park on the north side.

3          Kind of walk me through what happens at that

4  point.

5      A.    We parked there.  We were listening for a

6  disturbance.  We're not hearing anything on the north

7  side.

8          As we were kind of walking around looking, we

9  can hear a disturbance coming from the south side of the

10 apartment complex.

11     Q.    So the totally opposite side of the -- side

12 of the apartment complex?

13     A.    That is correct.

14     Q.    Okay.  And at that point, what were you

15 hearing?

16     A.    I was hearing someone say, "Help," "Get away

17 from me," things like that.

18     Q.    Could you tell if it was a male voice or a

19 female voice at that point?

20     A.    Sounded like a female voice to me.

21     Q.    Were they talking normal, talking loud, or

22 were they screaming at the top of their lungs?  How

23 would you describe that?

24     A.    I would say screaming at the top of their

25 lungs, considering the fact we could hear them from

1  he called.  Right?

2      A.    Yes, on the way up the stairs.

3      Q.    As you got -- this is happening as you all

4  are walking up the stairs together?

5      A.    Yes.

6      Q.    Okay.  What happens when you get to the top

7  of the stairs?

8      A.    If I recall, we -- the door was cracked open.

9  We knocked on the door, announced ourselves as police,

10 opened the door all the way so we could see inside the

11 apartment, and we made several announcements for people

12 to come out with their hands up.

13     Q.    You say the door was cracked open.  Can you

14 give me any kind of -- do you mean that you could -- it

15 was open where you could see inside the apartment at

16 all?

17     A.    No.  It was cracked open like probably about

18 that much or so.  Like, it was just cracked open.

19     Q.    Okay.

20          (Crosstalk)

21     A.    We could not see inside the apartment through

22 that tiny hole.

23     Q.    Okay.  Okay.  But I think -- I can see you

24 and obviously we have a video, but for the purpose of

25 the record, it looked to me like you were showing that

1  maybe the door was open approximately three inches?  Is

2  that -- is that --

3      A.    Roughly, yeah.

4      (Crosstalk)

5      Q.    -- your estimate?  Okay.

6      A.    Yes.

7      Q.    So you could tell the door was unlocked and

8  is open approximately three inches as you approach it.

9  Right?

10      A.    Yes.

11      Q.    Okay.  Do you knock on the door?

12      A.    I can't remember which one of us knocked on

13  the door, if it was Officer Rankine or I.

14      Q.    How many times did either you or your partner

15  knock on the door?

16      A.    I don't remember.

17      Q.    Did you make any kind of announcement as

18  you're knocking on the door?

19      A.    Yes.  We announced ourselves as Tacoma Police

20  numerous times.

21      Q.    And when you say "we," do you mean literally

22  both you and Officer Rankine are making the

23  announcement?

24      A.    Yes.

25      Q.    How many times did you all announce

1      Q.    Could you tell if any lights were on in the

2  apartment?

3      A.    Not that I remember.

4      Q.    Did you have any of your weapons out?

5      A.    Yes.  Additionally we had our firearm -- I

6  had my firearm out.

7      Q.    You had your Glock out?

8      A.    Yes.

9      Q.    Why did you have your Glock out at that

10  point?

11      A.    Well, I have no idea what I'm walking into.

12  It could be a person armed with a knife, a gun.  No clue

13  what's going to be on the other side of that door.

14      Q.    Okay.  Did you have a flashlight attachment

15  on your Glock?

16      A.    Yes.

17      Q.    Did Officer Rankine have his firearm out as

18  well?

19      A.    I believe so.

20      Q.    So I want to make sure I have it correct.

21      As my client, Dustin, is initially walking

22  toward you and Officer Rankine, both of you have your

23  firearms out and pointed into the apartment?

24      A.    That is incorrect.  We didn't have our

25  firearms pointing into the apartment.  They would have

1    TPD.

2        Q.    At the time where you see my client and, from

3    your perspective, it looks like he's taking a fighting

4    stance, how far away is he from you?

5        A.    I'd say within five or six feet.

6        Q.    And both you and Officer Rankine still have

7    your firearms out?

8        A.    Once I saw his hands were clear, I holstered

9    my weapon.

10       Q.    So you could tell he was unarmed; right?

11       A.    Yes.

12       Q.    And at the point he took what you say is a

13   fighting stance, where was he standing?

14       A.    He was inside the apartment, approaching us.

15       Q.    And is the apartment door at this point 100

16   percent open?

17       A.    Yes, or I wouldn't have seen him.

18       Q.    So the lighting is good enough that you could

19   see him, you can see there's nothing in his hands, you

20   can see that he is making fists.  So lighting is

21   sufficient for you to see what's going on at that point;

22   right?

23       A.    I believe I may have had my flashlight out.

24   But, yes, I was able to see his hands.

25       Q.    Was that a separate flashlight from the one

1    attached to your firearm?

2        A.    That is correct.

3        Q.    Okay.  So tell me what happens next.

4        A.    At some point, we say -- I say -- I'm fairly

5    certain I said, "Hey, we're going to detain you so --

6    until we figure out what's going on."

7              And then he comes out of the apartment and

8    says, "You guys have no legal right to detain me.  Tell

9    me why you're here."

10             And I say, "Hey, we're here to investigate a

11   possible domestic violence."

12       Q.    Anything else you recall telling him at that

13   point?

14       A.    "Please put your hands behind your back."

15       Q.    Anything else you recall telling him at that

16   point?

17       A.    Not that -- not that I can recall, no.

18       Q.    Is there anything else that you recall him

19   saying?

20       A.    I just remember him saying we didn't have the

21   legal right to be there or to speak with him.

22       Q.    Was Officer Rankine also giving any kind of

23   instructions or talking to my client or was it just you?

24       A.    I believe it was both of us --

25       Q.    Okay.

1    efforts to detain him.

2        Q.    Prior to you officers trying to handcuff

3    Dustin, did he ever charge at you?

4        A.    Yes, when he came out of the door.

5        Q.    He was running toward you at that point?

6        A.    No.  It was a pretty subtle walk towards.

7        Q.    Okay.  Did he ever run toward you?

8        A.    No.

9        Q.    Was he walking at a normal pace as he

10   approached you?

11       A.    I'd say a pretty normal, steady pace, yes.

12       Q.    And other than having his hands clenched in

13   fists at his side, was he doing anything else that was

14   threatening at that point?

15       A.    Yes.  Bladed stance and his chin was tucked

16   down, which is, from my training and experience, a

17   fighting -- what we call a fighting stance.

18       Q.    He had a bladed stance while he was walking

19   towards you?

20       A.    Yes.

21       Q.    Other than those things described, was he

22   doing anything to you that seemed threatening?

23       A.    Not following commands.

24       Q.    Okay.  Did he -- did he say any threats to

25   you?

1      A.    No.

2      Q.    Okay.  I think we've gotten to the point

3  where you testified that Officer Rankine is holding,

4  let's say, the upper body -- well, you correct me if I

5  got it right.

6            Sounds like Officer Rankine is grabbing more

7  upper body, you're grabbing a leg, and you're trying to

8  drag Dustin down to the second landing.

9            Is that correct?  Is that a fair summation of

10 what is happening?

11     A.    Yes, that's correct.

12     Q.    And then what happened?

13     A.    Eventually we were able to get him down to

14 the landing, and he ran out of energy and allowed us to

15 put his hands behind his back and handcuff him.

16     Q.    Okay.  At any time during the incident, did

17 Officer Rankine have an arm around my client's neck?

18     A.    Yes.  That would have been the control hold

19 around his shoulders and neck, yes.

20     Q.    Do you know how many times that happened?

21     A.    I believe it was one continuous hold.

22     Q.    So from your perspective, there was one

23 continuous hold where Officer Rankine was putting some

24 pressure on my client's neck?

25            ATTORNEY JOLLEY:  Object as to form.

1          ATTORNEY YOTTER:  Objection to form.

2          Court reporter, did you get both of those

3    objections?

4          Okay.  Thank you.

5          Officer Ford, you can go ahead and answer.

6          THE WITNESS:  Okay.

7     A.    Can you repeat the question one more time,

8    please?

9     Q    (By Attorney Ericksen)  Yeah.

10          Well, I'm just trying to understand what you

11   were saying.  I think you just testified that from your

12   perspective, there was one -- Officer Rankine was doing

13   one continuous hold.

14          Did I hear that correctly?

15     A.    That is correct.

16     Q.    Okay.  And using that one continuous hold,

17   you believe he was putting pressure on my client's neck;

18   is that correct?

19          ATTORNEY JOLLEY:  Form.

20     A.    No.

21          ATTORNEY YOTTER:  Objection as to form.

22     Q    (By Attorney Ericksen)  That one continuous

23   hold, did Officer Rankine have an arm around my client's

24   neck?

25     A.    Yes.

1      A.    Yes.

2      Q.    Is that something you mentioned to Sergeant

3  Kitselman, that there should be a video that would show

4  the incident and how it happened?

5      A.    Not that I remember.

6      Q.    Is there a reason why you didn't mention that

7  to him?

8      A.    Well, we always get video-recorded, so it's a

9  pretty normal part of police work.  So I'm used to it.

10      Q.    Did you or Officer Rankine have body cams

11  when you were working that night?

12      A.    I wish we did but, no, we did not.

13      Q.    Was TPD using body cams back in December

14  2019?

15      A.    No.

16      Q.    Would it be fair for me to say that -- you

17  know, obviously we have video for part of the incident,

18  but the parts of the incident that are not on video,

19  would it be fair for me to say that we have to rely on

20  witness testimony to understand what happened?

21      A.    That is correct.

22      Q.    And I'm guessing now -- you still work for

23  TPD; correct?

24      A.    Yes, I do.

25      Q.    And you use a body cam now; right?

1  understand you're still under oath, just like you were

2  before; right?

3      A.    Yes, sir.

4      Q.    Kind of before we move on to other things, I

5  want to make sure that I understand what force you used

6  on my client.

7            What I gathered from our conversation is

8  you -- you grabbed his arm -- hands and arms and are

9  trying to handcuff him, and you grabbed a leg and you

10 were helping drag him down the stairs.

11           Is that correct?

12      A.    That is correct.

13      Q.    Other than those two things, did you use any

14 kind of force on Dustin?

15      A.    At some point during the altercation, I used

16 a hair hold.

17      Q.    And how would you describe the hair hold?

18      A.    He had about shoulder-length hair, so I

19 grabbed a handful of it and pushed his head towards the

20 ground to keep him from getting up.

21      Q.    Is that something you were trained at TPD?

22      A.    That was something that we learned in the

23 academy.

24      Q.    And what kind of training do you recall

25 getting at the academy about hair holds?

70

1  Q.   Okay.  Did they scream things like, "Don't
2  hurt him"?
3  A.   Probably.
4  Q.   During the detention, during the arrest, were
5  there any indications to you that Dustin was having
6  trouble breathing at any point?
7  A.   No.  At no point did I hear him say that he
8  could not breathe.
9  Q.   I just want to make sure we're communicating
10 effectively.
11      Other than him literally saying that, "I'm
12 having" -- you know, "I can't breathe," were there any
13 indications to you at all that he might be having
14 trouble breathing?
15 A.   No.
16 Q.   Can you give me any kind of description of
17 the two female witnesses who were there?
18 A.   I remember one of them was wearing a pink
19 bathrobe.  And I can't remember -- that would have been
20 the older female, who was Vanessa.  And I can't remember
21 what her daughter was wearing.
22 Q.   Writing police reports is an important job,
23 part of a police officer's job; right?
24 A.   Yes.
25 Q.   And that's something you were trained to do

72

1   Dustin apparently trying to do a double-leg takedown on

2   you, that is something you have surmised he was trying

3   to do years after the fact --

4       A.   Yes.

5       Q.   -- after thinking about it more?

6       A.   That is correct.

7       Q.   And after talking about it with people more?

8       A.   Yes.

9       Q.   Other than with your attorney, who I don't

10  want to hear anything that you ever have spoken about

11  with, who have you spoken with about this incident?

12      A.   Officer Rankine and Sergeant Kitselman.

13      Q.   Other than those two people, have you ever

14  spoken with anyone else about this incident?

15      A.   Not in detail, no.

16      Q.   Okay.

17      A.   Other than my lawyer, obviously.

18      Q.   Do you agree with me that if you thought a

19  sexual assault had occurred, that would be an important

20  fact that would be important to put in a police report;

21  right?

22      A.   Absolutely.

23      Q.   Is that something you put in your police

24  report?

25      A.   No.

1     Q.    Did you think a sexual assault had occurred?

2     A.    I didn't know what had occurred because the

3 victim was completely uncooperative.

4     Q.    Okay.

5     A.    I could guess all day long what happened, but

6 the fact of the matter is I put in my report what I

7 heard.  And I could guess a million different reasons

8 why she was screaming that, but the fact of the matter

9 is, she was uncooperative so it would only be a guess.

10     Q.    Right.

11     What was happening between her and Dustin,

12 you would just be speculating as to what was going on;

13 right?

14     A.    That is correct.

15     Q.    Did you use your Taser at all during this

16 incident?

17     A.    Yes, I did pull it out, arm it, and tell both

18 Vanessa and her daughter to go back -- to back away from

19 us.

20     Q.    Did you point the Taser at them?

21     A.    I don't remember pointing it directly at them

22 but I did point it towards up the stairs, though.

23     Q.    Did you do a spark test or anything like

24 that?

25     A.    No.

 1      Q.    Why did -- why did you pull out the Taser?

 2      A.    As an intimidation tool.

 3      Q.    And what were you trying to do at that point?

 4      A.    To get them to get away from us.  It was

 5    three against two at that point.

 6            Well, actually, if you would include the dog,

 7    it would have been four on two.

 8      Q.    Okay.  Did the -- did the dog play any role

 9    in this incident?

10      A.    Yeah.  It tried to bite me.  I'd say it did

11    bite me in the hand, but it was a tiny Yorkie so it was

12    inconsequential.

13      Q.    Do you recall, at what point in the incident

14    did that happen?

15      A.    While we were fighting on the stairs, I

16    remember it coming down.  And then once we got Mr. Dean

17    on the ground on the second floor landing, like it was

18    at my hands like nipping at me.  And so --

19      Q.    Okay.

20      A.    -- I just swatted it away and I think it went

21    back upstairs.

22      Q.    Right.  This is a little 10-, 15-pound dog;

23    right?

24      A.    Less than that.  It's a Yorkie.  So I -- five

25    pounds.  I don't know.

1      Q.    Do you recall Officer Rankine ever using bad

2   language during the arrest?

3      A.    I believe he said like "Put your effing hands

4   behind your back" or something along the lines of that.

5      Q.    In your experience, was that typical for

6   Officer Rankine to use language like that when detaining

7   someone?

8            ATTORNEY YOTTER:  Object as to form.

9            (Crosstalk)

10           THE COURT REPORTER:  I didn't hear, Officer

11  Ford.  If you could maybe pause a little bit after the

12  question so the objections cannot talk over you.

13           THE WITNESS:  "No."

14      Q    (By Attorney Ericksen)  Is that the only time

15  you ever heard Officer Rankine curse during -- during an

16  arrest?

17      A.    Not that I really remember.  I think that's

18  probably about it.

19           I mean, Officer Rankine is pretty even keel,

20  so takes a lot to get him upset.

21      Q.    Right.

22           If a police officer is saying, "Put your

23  fucking hands behind your fucking back right now," does

24  that indicate to you that they're out of control?

25           ATTORNEY JOLLEY:  Object to the form.

1      A.    I'm not sure.

2      Q     (By Attorney Ericksen)  You just don't

3   remember one way or the other whether he said that or

4   not?

5      A.    You have to ask Officer Rankine, because he's

6   the one who said it.  So I do not recall if he said that

7   or not.

8      Q.    I think you've kind of mentioned this in a

9   general way, but talk with me about what kind of

10  interaction you had with the two female witnesses after

11  Dustin is in handcuffs.  Kind of walk me through what

12  happened there.

13     A.    I remained with Mr. Dean after he was taken

14  into custody, so I didn't have any interaction with the

15  females.

16     Q.    Okay.  Okay.

17           So if I recall your -- recall testimony

18  earlier about them being uncooperative, that was not

19  them being uncooperative with you, that's something that

20  someone else reported to you?

21     A.    Yes, that is correct.

22     Q.    Who told you they were being uncooperative?

23     A.    I believe it was Officer Rankine who told me

24  that.

25     Q.    I mean, fair for me to say you don't

1      personally know one way or the other how cooperative or

2      not they were?

3              A.      That is correct.

4              Q.      Would I have it correct that once Dustin is

5      in handcuffs, you stayed with him the rest of the time

6      you were on scene?

7              A.      That is correct.

8              Q.      And you -- Dustin had a visual injury from

9      this incident; right?

10             A.      Yeah.  His lips.

11             Q.      His lip was busted?

12             A.      I believe so, yes.

13             Q.      Was there visible blood?

14             A.      Yes.

15             Q.      And I believe your testimony was you called

16     fire to have a unit come and look at him?

17             A.      That is correct.

18             Q.      Did you tell Sergeant Kitselman that Dustin

19     had a visible injury?

20             A.      Yes.

21             Q.      Okay.  So you're there at the scene.  After

22     you have called fire, from your perspective, what

23     happened next?

24             A.      The fire department responded.  Mr. Dean was

25     belligerent with them, didn't want to answer any of

1      Q.    When investigating a domestic violence case,
2  do you ask the alleged victim to provide a written
3  statement?
4      A.    That is correct.
5      Q.    Do you know if that was done in this case?
6      A.    I'm not sure, but I would assume that they
7  asked.  And it was denied.
8      Q.    But you didn't --
9      A.    You'd have to ask the officers who spoke with
10  her.
11      Q.    Okay.  But you didn't, did you?
12      A.    As I said, I stayed with Mr. Dean.  So, no, I
13  did not.
14      Q.    Do you know if anyone asked Vanessa's
15  daughter, who was there, to give a written statement?
16      A.    All that was relayed to me was both of them
17  were uncooperative.
18      Q.    And that's something that was related to you
19  by Officer Rankine?
20      A.    Yes.
21      Q.    Who went to -- well, the gentleman who let
22  you into the building, who went to him to ask for a
23  written statement?
24      A.    I'm not sure.
25      Q.    Is it possible no one did?

1    A.    Possibly, yes.

2    Q.    When Dustin is walking toward you inside the

3    apartment, you have a flashlight out and you can see

4    inside the apartment.

5          Do I have that correct?

6    A.    That is correct.

7          (Mr. Rankine enters)

8    Q.    (By Attorney Ericksen)  Was there anything

9    you saw in the apartment that looked like people had

10   been throwing things against the wall or that some kind

11   of disturbance like that had been happening?

12   A.    Not that I could see from that angle, no.

13   Q.    I think we established this.  You were aware

14   that one of the female witnesses was making a video

15   recording with her cell phone.  Right?

16   A.    That is correct.

17   Q.    Did you ever do anything to try and get a

18   copy of that cell phone video?

19   A.    No.

20   Q.    Are you aware if anyone at TPD ever tried to

21   get a copy of that cell phone video?

22   A.    To my knowledge, no.

23   Q.    That's just not part of TPD's policies and

24   practices?

25   A.    It is for cooperative folks.  And as I said

1   have been appropriate.

2       A.   It would have depended on what point -- like,

3   there is so many variables for that question.  It's kind

4   of a loaded question, to be honest with you.

5       Q.   So I gather from your response, you think

6   there was a circumstance that would have justified

7   Tasing Dustin?

8       A.   It would really depend.  Neither of us found

9   it reasonable to Tase him, which is why he was not Tased

10  in this incident.

11      Q.   Because it would not have been reasonable to

12  do so; right?

13          ATTORNEY YOTTER:  Object as to form.

14          Go ahead and answer.

15      A.   It would depend.

16      Q    (By Attorney Ericksen)  Would it have been

17  appropriate for officers to strike Dustin during this

18  incident?

19      A.   I would -- he was -- he was not combative.

20  And by that, I mean throwing punches or strikes.  So no.

21  Which is why neither of us threw any strikes for this

22  incident.

23      Q.   How would you classify Dustin's level of

24  resistance during the incident?

25      A.   Active resistance, meaning using his muscles

1   to prevent us from putting his hands behind his back.

2       Q.    And when a suspect is doing active

3   resistance, what types of force are justified by TPD

4   policy?

5       A.    We can use control holds, pain compliance.

6       Q.    Would control holds include neck restraints?

7       A.    You specifically -- like lateral vascular

8   neck restraints?  Or what do you mean?  There's a lot of

9   neck restraints out there.

10      Q.    Yeah.  I'm trying to use the large umbrella

11  term "neck restraint."

12            (Crosstalk)

13      Q.    Not specifically just an LVNR.

14      A.    I mean, it would depend.

15      Q.    So you think there is situations where a

16  suspect's level of resistance is active resistance where

17  it would be appropriate to use a neck restraint on them?

18      A.    When you say "neck restraint," are you using

19  a -- that's too big -- I need you to be more specific on

20  that.

21      Q.    You don't understand what a neck restraint

22  is?

23      A.    I do.  I understand that there is about this

24  many different types of neck restraints.  Like there's

25  tons of different types.

1    the 00-second mark; right?

2        A.    That's correct.

3        Q.    I'll go back to the 15-second mark and I'm

4    going to hit play.  We'll watch some more.

5            (Playing video)

6        Q.    Did you threaten to Tase the female

7    witnesses?

8        A.    Is my Taser even out yet?

9        Q.    That wasn't my question.

10            Did you threaten to Tase them?

11        A.    I'm not -- I can't remember what I said.  You

12    can play the video; it should tell us.

13        Q.    Okay.

14            (Playing video)

15        A.    Get back in the house or you're going to get

16    Tased.

17        Q.    That's you talking; right?

18        A.    Sounds like me.

19        Q.    Okay.  And that's you talking to someone who

20    you know is taking a video of this arrest; right?

21        A.    Clearly, yes.  They had a phone in their

22    hand.

23        Q.    Okay.  Now, do you know one way or the other

24    whether you had your Taser out at that point, or were

25    you just talking to them?

1  from 27 seconds.  I'm going to play a bit -- play a bit

2  more.

3              (Playing video)

4      Q.    Stopped at timestamp 46 seconds, for the

5  record.

6              A couple seconds before there, is that where

7  you took your Taser out?  Did you see that?

8      A.    I believe so, yes.

9      Q.    And you took your Taser out to intimidate the

10  two female witnesses?

11      A.    The two females that were actively trying to

12  get involved in the fight?  Yes, I did.

13      Q.    Hitting play again, we're at the 46-second

14  mark.

15              (Playing video)

16      Q.    I've stopped the video at the 59-second mark.

17              Here, can you see the Officer Rankine with

18  both of his arms around Dustin's neck?

19      A.    It would appear so.

20      Q.    If Dustin says that he felt like he was being

21  choked in that moment, do you have any reason to dispute

22  that?

23              ATTORNEY JOLLEY:  Object to the form.

24              ATTORNEY YOTTER:  Object as to form.

25      A.    You'd have to ask your client.  I don't know

1       Q.    So the video we have, it's three minutes, 43

2  seconds.  We just watched the whole thing.

3             Did you tell Dustin why he was being

4  detained?

5       A.    We told him in the beginning.

6       Q.    Okay.  So it was sometime before this video

7  started, he was told why he was being detained?

8       A.    Yes.

9       Q.    But during this three minutes and 43 seconds

10  where we have video evidence, do you agree with me he

11  was not told why he was being handcuffed and detained?

12       A.    That is correct.  I wish she had recorded

13  longer.

14       Q.    And during the video evidence we have, three

15  minutes and 43 seconds, was Dustin told why he was being

16  arrested?

17       A.    No.

18       Q.    At the very beginning of the deposition, I

19  asked you briefly if you've given other depositions.

20             Do you recall that?

21       A.    Yes.

22       Q.    How many other depositions have you given,

23  sir?

24       A.    Well, I've been a police officer for seven

25  years now, so that would be kind of hard to tell you,

1                    FURTHER EXAMINATION

2    BY ATTORNEY ERICKSEN:

3         Q.    Very briefly, sir.

4               So what you -- what you did see, what you did

5    observe, is you observed Officer Rankine had two arms

6    around Dustin's neck; correct?

7         A.    That is correct.

8         Q.    And when that was happening, you were

9    standing behind Officer Rankine?

10        A.    Kneeling behind, I believe.

11        Q.    From that position, would you be able to see

12   whether or not Officer Rankine was making direct contact

13   with my client's neck?

14        A.    From that vantage point, no.

15              ATTORNEY ERICKSEN:  I think we're probably

16   done.  I appreciate it, sir.

17              THE WITNESS:  Thank you for your time.

18              THE VIDEOGRAPHER:  Should we conclude the

19   deposition?

20              ATTORNEY JOLLEY:  No follow-up here.  Thank

21   you.

22              ATTORNEY YOTTER:  Nothing from the City.

23              ATTORNEY ERICKSEN:  We're done.

24              THE VIDEOGRAPHER:  Okay.  We'll go off the

25   record, then.