# EXHIBIT D

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT TACOMA
_____

DUSTIN DEAN,                           )
                                       )
        Plaintiff,              )
                                       )
  vs.                                  )  No. 3:21-cv-05822-MJP
                                       )
CITY OF TACOMA, TIMOTHY                )
RANKINE, and MASYIH FORD,              )
                                       )
        Defendants.             )


_____


Remote Videotaped Deposition Upon Oral Examination

of

SERGEANT TODD KITSELMAN
_____


1:49 p.m.

January 16, 2025

Witness Location: Tacoma, Washington




Karmen Knudson, RPR, CRR, CCR #1935

1  Q.  Okay.  So after you have that, you're talking
2  with Ford and Rankine, you ask them if they're okay.
3  They confirm that they are.
4      Did you ask them any other questions?
5  A.  Just to give me a brief summary of what
6  happened, knowing that their reports will be more
7  detailed.  And then I will take what they've told me,
8  based on my observations at the scene, and then their
9  written record of what happened, I will then evaluate
10 that application of force to see if it was reasonable,
11 necessary, and within policy.
12 Q.  What do you recall about their explanation of
13 what happened there at the scene?
14 A.  I wrote it in my supervisor's report.
15     The short version is that he came out of the
16 doorway -- well, my recollection of it was that they
17 said they could hear items being thrown around, banged
18 around, female asking for help.  That noise enabled them
19 to locate the apartment in question, because they
20 weren't exactly sure which one it was.
21     And then they knocked on the door, which it
22 was ajar, and it opened partially.  And they called out,
23 identified themselves as police officers, told whoever's
24 inside to come out with their hands up.
25     And they have a duty to intervene, lawfully,

1  report is what I told them to put -- to arrest him for.
2      Q.   Misdemeanor obstruction, city charge?
3      A.   Is that what's there?  I would assume.  That
4  sounds right.
5      Q.   If more serious charges were justified, would
6  you all have brought more serious charges?
7      A.   Yes.
8      Q.   If domestic violence charges were justified,
9  you absolutely would have brought those charges;
10 correct?
11     A.   Yes.  It's mandatory, yes.
12     Q.   So I want to make sure I understand.
13          So if you have probable cause to believe
14 domestic violence has occurred, it is mandatory for you
15 to make an arrest?  Do I have that right?  Correct me if
16 I'm wrong.
17     A.   Yes, you have that correct.  It's one of the
18 few mandatory arrest laws.
19     Q.   Okay.  So you have a conversation with the
20 officers about charges.  It sounds like -- would it be
21 fair -- correct me if I'm wrong, but it sounds like a
22 collective decision to charge him with the misdemeanor
23 obstruction charge?
24     A.   Well, the way I usually run those types of
25 things is, I want -- I want to always evaluate how my

1  decision has been made on a charge, decision has been
2  made to get possible medical aid for my client.
3          What else are you doing while you're on
4  scene?
5      A.   That's really it.
6          I make sure I have all the information that I
7  need, and then I'll -- I'll wait until those reports are
8  submitted and that will be part of what I used in my use
9  of force investigation.
10     Q.   As part of your work on scene, did you ever
11 go and try to speak with the possible domestic violence
12 victim?
13     A.   No.  My function is not investigative for the
14 incident they're there for.
15     Q.   Okay.
16     A.   So as a supervisor, we don't do that.  Our
17 officers do that.
18     Q.   Okay.  So your -- I appreciate you clarifying
19 that.
20          Well, characterize it for me.  You know, what
21 is your supervisory role there on scene?  What is it?
22     A.   So I'm there for the application of force
23 and -- and I initially responded that direction, because
24 a lot of times you'll start towards a call and before
25 you get there, they'll say, "One in custody, no

1  problems" and won't request a supervisor.
2           And I'm a big proponent in most cases, unless
3  you need the direct supervision, of letting officers
4  autonomously work.  Unless you prove otherwise to me
5  that you need my direct supervision, then I'm going to
6  be there to make sure it's done correctly.
7           I had no such concerns with those two.  So
8  had they "One in custody, no problems" and not requested
9  a supervisor, I would have turned around and went
10 somewhere and did something else, addressed the mountain
11 of paperwork that's always waiting.  Something like
12 that.
13     Q.   Yeah.  So your only role on scene is to
14 evaluate the use of force; is that fair to say?
15     A.   At that point, yes.
16          Had I arrived during the altercation, I would
17 have helped out.  Correct.
18          And then had I used force, then my lieutenant
19 would have to come out and evaluate it.  It has to be a
20 rank above you that investigates that report -- that use
21 of force application.
22     Q.   Right.  Right.
23          And in evaluating the use of force, you don't
24 go to try to interview witnesses who may have seen the
25 use of force?

1     A.   I wasn't aware of any witnesses that
2  evaluated it, other than an uncooperative victim.  That
3  was the only witness I was aware of.
4     Q.   How do you know it was an uncooperative
5  victim?
6     A.   I think -- again, this is my recollection
7  years later.
8          In the telling of the incident, they
9  explained that somebody was trying to pull -- I don't
10 remember which officer off of the -- off of Mr. Dean,
11 and a draw-and-direct technique with a Taser, which is
12 not a reportable use of -- then it wasn't a reportable
13 use of force.  It is now, today, under the current
14 policy.  Then it wasn't.
15         I think it was Masyih that used the draw and
16 direct with a Taser.  So it has a red dot on it, so you
17 activate it so the red dot comes on, and had to order
18 her away.
19         And in the telling of what happened in the
20 short version, I was told she doesn't want to be victim,
21 she said nothing happened, she's not happy with us for
22 arresting him.  So --
23    Q.   Who told you that?
24    A.   I don't recall which officer.  That was the
25 impression I left with, what they told me.  I don't

1 recall who was speaking.
2     Q. Okay. So to be clear, you never personally
3 tried to speak with the female-possible-domestic-
4 violence victim?
5     A. Correct, I did not.
6     Q. Were you aware that there was another woman,
7 her adult daughter, who was there? Were you aware that
8 there was a second possible witness on scene who may
9 have seen things?
10     A. I was not.
11     Q. Did either Officer Ford or Officer Rankine
12 tell you that one of these witnesses had their phone out
13 like they were doing a cell phone video of the incident?
14     A. No.
15     Q. Did Officer Rankine report to you that he had
16 yelled the F word multiple times during the incident?
17     A. No.
18     Q. Is that something he should have reported to
19 you?
20     A. No.
21     Q. Why do you say that?
22     A. Well, getting into the minutia of why, the
23 courtesy policy exists for the extraneous use of
24 profanity when it's not required. There is a time and a
25 place for it. It's taught that way in our departmental

1     Q.   Okay.  I'm going to go ahead and hit play.
2 We're starting at the 1:28 mark.
3         (Playing video)
4     Q.   And, Sergeant, that was the end of the video.
5         Do you know one way or the other whether one
6 of the witnesses called 9-1-1 and asked for help at that
7 point?
8     A.   I don't know.
9     Q.   That's not something that would ever come up
10 in your review?
11     A.   No.  There's no mechanism for that to come
12 up.
13     Q.   Did Officers Ford and Rankine tell you that
14 they both had their Glocks out when they approached the
15 apartment?
16     A.   I don't recall if they did or they didn't.
17 But at that point, that wasn't a reportable use of
18 force, so there's no obligation for them to tell me.
19     Q.   Right.
20         Would that be -- would that be appropriate
21 for them to have their Glocks out as they open the door
22 to the apartment?
23     A.   Absolutely.  I would have done the same
24 thing.
25     Q.   The video that we just watched, a little

1   under four minutes, do you agree with me that's the only
2   video evidence that we have of what happened during this
3   incident?
4       A.    To my knowledge, yes.  I just found out about
5   it a few months ago.
6       Q.    Right.
7       There is no video what happened before that
8   video started; right?
9       A.    I -- I don't have any knowledge of any.
10      Q.    So as far as what happened before that camera
11  turned on, would it be fair for me to say we have to
12  completely rely on witness testimony as to what
13  happened?
14      A.    Sure.
15      Q.    Did Officer Ford ever tell you that he
16  suspected that a sexual assault was happening that
17  night?
18      ATTORNEY JOLLEY:  Object to the form.
19      A.    No, he did not.
20      Q    (By Attorney Ericksen)  Did Officer Ford ever
21  tell you that he thought Dustin was trying a -- what he
22  termed a double-leg takedown, MMA style, during this
23  incident?
24      ATTORNEY JOLLEY:  Object to the form.
25      ATTORNEY YOTTER:  The City joins.

1  within policy.
2      Q.   Okay.  And I know it's different now because
3  the law has changed since then, but back in December
4  2019, based on what you know of the incident, based on
5  the video we saw, would it have been appropriate for the
6  officers to use -- to intentionally use a chokehold on
7  Dustin?
8      A.   No.  But one didn't occur, so I'm not sure
9  where your question is going.
10     Q.   Right.
11          I'm just trying to understand kind of what
12 the limits are.  So why do you say -- so a Taser, an ASP
13 baton, strikes, that's all appropriate, but a chokehold
14 wouldn't be.  What's the distinction there at --
15          ATTORNEY JOLLEY:  Object to the form.
16          ATTORNEY YOTTER:  The City joins.
17     A.   So any application of force, you have to
18 assess the subject's actions.  And based on that
19 assessment, you have to maintain control superiority.
20 Right?
21          So if they're assaultive -- let's see.  If
22 they're assaultive and you apply a deadly application of
23 force, such as an LVNR -- which even technically back
24 then wasn't -- wasn't decided upon as a deadly use of
25 force, even then.  It is now.  But back then, it wasn't.