# EXHIBIT E

```
 1                UNITED STATES DISTRICT COURT
 2               WESTERN DISTRICT OF WASHINGTON
 3                         AT TACOMA
   _____
 4
   DUSTIN DEAN,                                )
 5                                             )
             Plaintiff,                        ) No. 3:21-cv-05822
 6                                             )
             v.                                )
 7                                             )
   CITY of TACOMA, TIMOTHY RANKINE, and        )
 8 MASYIH FORD,                                )
                                               )
 9           Defendants.                       )
   _____
10
11         VIDEO-RECORDED DEPOSITION OF JAMES PUGEL
12                    February 18, 2025
13            Reported via Zoom Video Conference
   _____
14
...
24 Reported by:  ANN MARIE G. ALLISON, CCR
                 Certified Court Reporter #3375
25
```

```
 1            actively resisting?
 2    A       Yes.
 3    Q       Can you just briefly walk me through when you believe
 4            he was passively resisting and when you -- and when
 5            that transitioned into an active resistance?
 6    A       Based on -- the passive was when he was holding on to
 7            what they described as the banister or the pieces of
 8            wood in between the banister.  And they were trying to
 9            get his arms disengaged from that and get them behind
10            his back.
11    Q       Okay.  And we see all of that in the video.  Correct?
12    A       Yes.
13    Q       And I'm going to leave that part to Mr. Jolley to walk
14            through with you this afternoon.  But just so I
15            understand, your position is it's passive resistance
16            when he barricaded himself, his arms through the
17            railings and he's preventing officers from handcuffing
18            him.  Correct?
19    A       Yes.  He's not being assaultive.
20    Q       Okay.  When was he being actively resistant?  What of
21            Mr. Dean's action do you consider active-resistant?
22    A       Well, you know, it's not a -- it's not a scientific --
23            he was not assaulting and he was not trying to escape.
24    Q       Let me back -- let me back this up a little bit maybe
25            for my own knowledge.
```

```
 1        low-level passive, high-level passive, medium-level
 2        passive?  Are there subcategories within those boxes or
 3        is passive one general group?
 4   A    It's a general group.  I think we're both agreeing that
 5        there's a spectrum within that.
 6   Q    Okay.  And so on the spectrum within the group, so --
 7        for example, if I'm -- would you consider it a
 8        low-level passive if I'm on the low end of passive
 9        resistance?
10   A    If you're wrapping your arms around a banister, that's
11        passive resistance.
12   Q    Where on the spectrum of passive does it fall?
13   A    Well, instead of just lying on the ground with nothing
14        to hold onto -- lying on the ground, for instance, when
15        we have protestors and they're just lying on the ground
16        and taking their arms and folding them underneath their
17        body, that's a low-level passive.
18   Q    Okay.
19   A    If they're -- like during many modern-day protests,
20        they'll use what's called "sleeping dragons."  They'll
21        put their hands inside of reinforced plastic or steel
22        pipe, there's a bar inside.  And they'll handcuff
23        themselves or affix themselves with a carabiner to
24        those.
25   Q    What level is that?
```

1       arm or the LNVR.
2   Q   Let's take a look at your report. And similar to
3       Ms. Yotter, if you want to just look at yours, that's
4       fine, or I can just put it up on the screen, whatever's
5       easier for you. But I specifically want to ask you
6       about your opinions related to the neck restraint.
7   A   Okay. I've got my report up.
8   Q   Yeah. At page 17 of your report, you indicate:
9           That the video clearly shows that there was a neck
10      restraint applied to Mr. Dean by Officer Rankine.
11          When you use the term "neck restraint," tell me
12      the definition of neck restraint that you're relying
13      upon as you offer this opinion.
14  A   His arm was in contact for more than a moment with the
15      individual's neck.
16  Q   And so the definition that you're using is not reliant
17      upon an effort to restrict blood flow to the brain as
18      it relates to a neck restraint?
19  A   No, it's anywhere near -- it's any -- making contact
20      for more than -- an inadvertent contact, a moment in
21      time, any type, can be viewed as a neck restraint.
22                  ATTY JOLLEY: What I'm going to do now, and
23  we have not actually marked this as an exhibit yet. And,
24  Matthew, it's up to you. We've all got copies of the video.
25  Do you want to actually -- do we need to make this an

1  A   What I see is Officer Rankine's hand coming back to his
2      body and combine that with the video.  His arm was
3      underneath the chin and above the chest area --
4      centered in the neck area.
5  Q   So now I'll show you what we'll mark as Exhibit 7.
6                  (Exhibit 7 marked)
7          And this photo is labeled, "Chokehold Photo
8      No. 2."  And again, I take it that this is not
9      something that you can -- that you constructed or
10     pulled out from the video?
11 A   I did not.
12 Q   So I want you to remember this because we're going to
13     take a look at this on the video in a moment.
14              (Court Reporter requests clarification)
15                  ATTY JOLLEY:  Sure.  My apologies.
16 Q   (By Atty Jolley) What's depicted here in Exhibit 7, do
17     you believe that this is depicting, first off --
18              (Court Reporter requests clarification)
19 Q   -- a neck restraint?
20 A   Well, the officer's arm is around the individual's neck
21     and he's trying to control him.  So yes.
22 Q   And as we look at this photo, what does it appear that
23     the officer is trying to do as he's trying to control
24     him?
25 A   Pull him away -- I mean, I can't go into the mind of

1                    (Video played)
2              Did it appear that Officer Rankine was trying to
3         pull plaintiff away from the railing or the banister
4         when he had his hands underneath plaintiff's chin at
5         roughly 58 or 59 on the video, to 1:02?
6    A    Yes.
7    Q    And do you think that that's excessive or unreasonable
8         under these circumstances?
9    A    **You don't go for the neck.  Okay?  You don't go for the**
10        **neck unless you have a justification for lethal force.**
11   Q    And let me ask the question again:  What we observed
12        from 58 to 1:03, where Officer Rankine pulls plaintiff
13        away from the banister, is that excessive force, based
14        on your understanding of what's permissible under the
15        Fourth Amendment?
16   A    **Pulling an individual away is totally permissible,**
17        **going around the neck is incredibly dangerous.**
18   Q    And so is it your opinion that what we see from 58 to
19        1:03 is a violation of the Fourth Amendment because
20        it's excessive force?
21   A    **I don't know if it's a violation -- can we agree that**
22        **his arms are around his neck?**
23   Q    That's not my question, Mr. Pugel.
24   A    **Okay.  Okay.  So we agree on that.  And you're asking**
25        **if it's appropriate, I'm saying you don't go for the**

1          neck.  There are other ways to pull him away from the
2          banister.
3     Q    If you were sitting on the Force Review Board at the
4          City of Seattle and you were watching a Seattle officer
5          do the exact same thing under these exact
6          circumstances, where they're pulling someone away from
7          the banister after there's been a struggle that's been
8          going on for at least a minute and they have probable
9          cause to arrest the subject, would that officer have
10         been disciplined specifically for using excessive
11         force?
12    A    Surprisingly, there was an attorney that sat next to me
13         on those FRBs that was specifically appointed by
14         Merrick Bobb.  His name was Peter Ehrlichman, and he
15         would have said, absolutely.  That not only violates
16         the Fourth Amendment, but that violates policy because
17         he didn't report it.
18    Q    And so since Mr. Ehrlichman is not the named expert on
19         behalf of the plaintiff here, I'm asking you, if you're
20         reviewing this and you're sitting on the Force Review
21         Board at the City of Seattle, would it have been your
22         opinion that the officer here was engaging in excessive
23         force when he pulled plaintiff away from the banister?
24    A    Around the neck, yeah.
25                        (Video played)

1  Q   Now, we've just watched from one minute to a minute 14
2      of the video.  Do you see either officer doing anything
3      that you would deem to be outside of generally accepted
4      police practices from one minute to a minute 14?
5  A   **No.  After they get him down the landing, no, it's**
6      **still a struggle and they're just trying to get him**
7      **under control.**
8  Q   And what about the presence of the dog?  Does that,
9      likewise, complicate things for the officers and
10     increase the tempo of this particular incident?
11 A   **It's certainly distracting.  What is it, a Yorkie?**
12 Q   If Mr. Dean testified, going back to one -- and I'm
13     just going to play from a minute to about a minute
14     three -- I'm sorry let me go from 58 to a minute three.
15                     (Video played)
16         If Mr. Dean testified that at this moment, at 58
17     or 59, when Officer Rankine has his arm underneath
18     Mr. Dean's chin and is pulling him away from the
19     banister, if Mr. Dean testified that his breathing was
20     not restricted at that point, would you still conclude
21     that that was excessive force?
22 A   **It was -- again, can I just say it?  Putting arms**
23     **around the neck and applying force is improper force**
24     **unless you are using lethal force.**
25 Q   So, in essence, regardless of the circumstances, if

1  deadly force is not justified, it's never reasonable,
2  in your opinion, for an officer to pull someone around
3  the neck as we've just seen here from 58 to 1:03 of the
4  video?
5  A  Please ask that question again.  I mean, you're
6  asking --
7  Q  It's your opinion that unless deadly force is
8  justified, it's never legal, it's never constitutional
9  for an officer to actually have their arms around
10 someone's neck.  Is that correct?
11 A  Again, I'm not a lawyer.  I'm a use-of-force person
12 with 37 years of using and observing and judging and
13 approving or disapproving use of force.  To me, that's
14 an improper use of force around the neck.
15 Constitutional, I'm not a lawyer.
16 Q  Do you see a distinction between something that's
17 improper and something that is -- equates with
18 excessive force?
19 A  Improper and excessive force, what is --
20 Q  Oh, I don't mean to interrupt you.
21     Is there a distinction between someone using
22 improper techniques and engaging in excessive force?
23 A  I guess if you're going to dissect it with a scalpel,
24 sure.
25 Q  And just so we're clear, it's your opinion that

```
 1        Officer Rankine, at 58 of the video until 1:03, where
 2        he's pulling plaintiff away from the banister, that
 3        that's not only improper, but it's also excessive.  Is
 4        that accurate?
 5   A    In my opinion.
 6   Q    Yes?
 7   A    Yes.
 8   Q    Just on what we observed on the video, did it surprise
 9        you that the plaintiff did not want medical attention?
10   A    Surprise me?  Not necessarily, no.
11   Q    Why not?
12   A    I think he was more concerned with his physical safety
13        than his bleeding lip.
14                  VIDEOGRAPHER:  We seem to have lost
15   Mr. Jolley.  I'm going to take us off the record.  We are
16   going off the record, the time now is 4:42 p.m.
17                       (Recess)
18                  VIDEOGRAPHER:  We are back on record.  The
19   time now is 4:49 p.m.
20                  ATTY JOLLEY:  Mr. Pugel, my apologies for
21   the --
22                  THE WITNESS:  No problem.
23                  ATTY JOLLEY:  -- inconvenience.  I think
24   we're almost done.
25   Q.   (By Atty Jolley)  Did it surprise you that Mr. Dean
```

1  didn't need medical attention related to the neck
2  restraint, as you put it, that was employed by
3  Officer Rankine?
4  A  No.  To keep it abbreviated because I know we're near
5     the end, sometimes those things don't manifest
6     themselves until later.  But, no, I just think he just
7     wanted to be un-arrested and go home.
8           ATTY JOLLEY:  Mr. Pugel, that's all the
9  questions I have for you.  Maybe Mr. Ericksen wants to ask
10 you a few.
11
12                      EXAMINATION
13 BY ATTY ERICKSEN:
14 Q  Mr. Pugel, we just watched -- actually, not the
15    complete video, but we just watched part of the video
16    with Mr. Jolley.  Correct?
17 A  Yes.
18 Q  And at one point you were asked some questions about
19    Vanessa's hand reaching out to Officer Rankine.
20       Do you recall that?
21 A  Yes.
22 Q  I just wanted to be clear on the record.  Do you know
23    whether that hand was Vanessa's hand or her daughter's
24    hand?
25 A  I don't.

1  Q   So that would just be an assumption or a guess that
2      that was Vanessa that we see in the video?
3  A   **Yes, I have no way of knowing.**
4  Q   Okay.  Was there anything you saw in the video that
5      would indicate that either of the two female witnesses
6      tried to grab Officer Ford?
7  A   **Officer Ford was at the landing, so no.**
8  Q   Correct.  From the video, were any of the women close
9      enough that they could have grabbed Officer Ford?
10 A   **No.**
11 Q   Your work has included a review of Mr. Rankine's
12     deposition testimony.  Right?
13 A   **Yes.**
14 Q   And that included what the officer had to say about
15     whether he had an arm around the neck or ever put
16     pressure on Mr. Dean's neck?
17 A   **Yes.**
18 Q   I am not very good at this, but I'm trying to share my
19     screen right now.
20         Does this appear to be the expert report of
21     Officer Jeffrey Paynter?
22 A   **Yeah, it's not titled.  I've seen his reports for a**
23     **different case that I worked on, so I don't -- okay,**
24     **yes.  It says, "Dean v. Tacoma" at the bottom.**
25 Q   And this report is something that was provided to you

1    as part of your review.  Correct?
2  A  Yes.
3  Q  Looking at -- if you could, just to yourself -- we're
4     on page -- for the record, we're on page 24 of the
5     Paynter expert report.  If you could, sir, could you
6     read just to yourself, not out loud, but footnote 36.
7     Do you see that?
8  A  Yes.
9  Q  Okay.  Officer Rankine's statement in that interview
10    about what was going on with Mr. Dean and his neck, is
11    that at all consistent with his deposition testimony?
12              ATTY JOLLEY:  Object to the form.
13              THE WITNESS:  It differs.  I mean, it wasn't
14 mentioned at all on the night of the arrest.  This
15 year-later report with Mr. Paynter, it says this, and then
16 later in the deposition it didn't.
17 Q  (By Atty Ericksen) Right.  But part of the report says
18    Officer Rankine said they heard Dean began gasping for
19    breath.
20        That's not consistent with the deposition
21    testimony, is it?
22 A  Correct, no.
23              ATTY JOLLEY:  Object to form.
24              THE WITNESS:  I'm sorry.
25 Q  (By Atty Ericksen) And the state review of

```
 1         Officer Rankine said that he was putting pressure on
 2         Mr. Dean's neck.
 3              Is that consistent with the deposition testimony?
 4    A    No.
 5              ATTY JOLLEY:  Object to form.
 6              ATTY YOTTER:  And the city joins.
 7    Q    (By Atty Ericksen) Ultimately, sir, do you have an
 8         opinion as to whether Officer Rankine applied a
 9         chokehold or a neck restraint on Mr. Dean?
10    A    I would say he applied a neck restraint.  Whether it
11         was a chokehold, an LVNR, it was arm or arms around the
12         neck.
13    Q    The risk to Mr. Dean, if an officer has arms around his
14         neck and is impacting his ability to breathe, that risk
15         is present regardless of what technique the officer is
16         trying to do.  Right?
17    A    Yes.
18    Q    Based on the evidence we have here, was the neck
19         restraint applied by Officer Rankine, was it applied
20         one time briefly or did it happen more than once?
21    A    Based on my review it happened twice.
22    Q    Does that indicate to you anything, that it happened
23         more than once in such a short time frame?
24    A    One time -- it would lead me to believe that one time
25         it was inadvertent.  In my opinion, the second one was
```

```
 1            intentional.
 2    Q       Sir, do you have an opinion as to whether a neck
 3            restraint should be considered deadly force?
 4    A       In my experience, it's -- it has been considered --
 5            there was some agencies that did not consider it, but
 6            best practices has always been stay away from the neck.
 7    Q       And I guess if we could -- just for the record, I mean,
 8            "yes" or "no," would you consider a neck restraint a
 9            type of deadly force?
10    A       Yes.
11    Q       Is that something that was true at the time of
12            Mr. Dean's arrest, or is that a recent development just
13            in the last couple of years?
14    A       Well, state law, after this event it became deadly
15            force or equivalent with -- in many agencies, including
16            Seattle, it was considered lethal force.
17    Q       And I believe your testimony was that law enforcement
18            was starting to understand that chokeholds and neck
19            restraints were extremely dangerous back in the 1980s?
20    A       Dr. Reay was the King County Medical Examiner, and that
21            was what the general opinion and practice was and the
22            training against it.
23    Q       If Officer Ford and Officer Rankine considered this a
24            domestic violence call, did their response comply with
25            generally accepted police practices?
```

1  A   Police practices, no.
2  Q   Are police officers allowed to ask a possible domestic
3      violence victim to provide a written statement?
4  A   Yes.
5  Q   How about Officer -- Sergeant Kitselman, as the
6      defendant's supervisor, were his actions in accordance
7      with generally accepted police practices?
8  A   **In the material I reviewed, it led me to believe that**
9      **they were not.  He was not paying attention.**
10 Q   It was a few hours ago now, closer to the beginning of
11     your deposition than not, but do you recall some
12     questions about whether the officers were holding their
13     firearms at a low-ready or a high-ready position?  Do
14     you recall that?
15 A   Yes.
16 Q   And where you were getting the information or evidence
17     that either officer had their firearm in a high-ready
18     position.  Do you recall that?
19 A   Yes.
20 Q   I'm just sharing my screen, sir.  Do you see -- this is
21     Officer Rankine's supplemental report related to this
22     incident.  Do you see that?
23 A   Yes.
24 Q   If we go to the narrative, if you could, sir, just to
25     yourself, you don't have to read it out loud, just to

```
 1         yourself, could you read the fifth paragraph?  The
 2         paragraph begins at -- begins with:  A white male
 3         wearing gray pants.
 4              If you could, read that to yourself.
 5    A    Yes.  Yes, okay.  I read it.
 6    Q    Does that say anything about an officer having a
 7         firearm at a high-ready position?
 8    A    It says:
 9              Officer Ford and myself had our service pistols
10         drawn and was held at a modified high-ready position.
11    Q    Would that be consistent with the officers testifying
12         that they both held their firearms at a low-ready
13         position?
14    A    No.
15    Q    Again, this may have been a couple of hours at this
16         point -- ago at this point, but when you were asked
17         questions about probable cause, whether Officer Ford
18         had probable cause to arrest Mr. Dean, questions like
19         that, inherent in that statement is an assumption that
20         the officer's reports and deposition testimony are
21         accurate.  Right?
22    A    Yes.
23    Q    Okay.  We have a video that shows part of the incident.
24         Right?
25    A    Right.
```

1  Q   Would you consider the video objective evidence?
2  A   For what it presents in the moment it captures.
3  Q   Okay. But as far as what happened before the video
4      started, we have to rely on the testimony of the people
5      who were actually there. Right?
6  A   Yes.
7  Q   And as far as what happened -- anything that happened
8      after the video was over, we have to rely on the
9      testimony of the people who were there. Right?
10 A   Yes.
11 Q   Ultimately, it's not your job to say who was credible
12     and who is not. Right?
13 A   No, I wasn't -- no.
14 Q   And, ultimately, that's the jury's job. Right?
15 A   I believe so.
16 Q   And, ultimately, it's for the jury to decide whether
17     defendant's actions violated the constitution. Right?
18 A   At the end of the day, if it's a jury trial, yes; if
19     it's a bench trial, it's a judge. But yes, it's a
20     court of law.
21 Q   But your testimony, it's based on your training,
22     knowledge, experience, and generally acceptable police
23     practices and training. Right?
24 A   Yes.
25 Q   You were never hired to say definitively whether

1      Mr. Dean is more credible than Officer Ford or if
2      Officer Rankine's story makes more sense than Vanessa's
3      statement.  Right?
4  A   No.
5  Q   That's not your role.
6  A   Correct.
7             ATTY ERICKSEN:  I think those are the only
8  questions I have for you, sir.  I appreciate it.
9             ATTY YOTTER:  Nothing else from the City.
10            ATTY JOLLEY:  Nothing from Defendant Rankine.
11            ATTY YOTTER:  Mr. Pugel, thank so much for
12 your time today.
13            **THE WITNESS:  You're welcome.  Thank you.**
14 **Nice meeting both of you.**
15            ATTY JOLLEY:  Thank you.
16            ATTY YOTTER:  Before you go anywhere, let's
17 find out if the court reporter has any spellings.
18            VIDEOGRAPHER:  One second.  Let me just read
19 us off the record.
20       That will conclude the video-recorded deposition
21 of James Pugel.  We are now going off the record at
22 5:04 p.m.
23                  (Signature waived)
24
25