UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

DUSTIN DEAN,

     Plaintiff,

  v.

CITY OF TACOMA, TIMOTHY
RANKINE, MASYIH FORD,

     Defendants.

CASE NO. C21-5822 MJP

ORDER ON MOTIONS FOR
SUMMARY JUDGMENT

This matter comes before the Court on Defendants City of Tacoma's and Masyih Ford's

Motion for Summary Judgment (Dkt. No. 57) and Defendant Timothy Rankine's Motion for

Summary Judgment (Dkt. No. 61.) Having reviewed the Motions, the Response to both Motions

(Dkt. No. 65), the Replies (Dkt. Nos. 67, 70), and all supporting materials, the Court GRANTS

in part and DENIES in part both Motions.

## BACKGROUND

Plaintiff Dustin Dean brings federal and state law claims against the City of Tacoma and

two officers, Timothy Rankine and Masyih Ford, who arrested him while they were investigating

1   a reported domestic violence incident. Dean alleges that the officers were not justified in entering

2   his home without a warrant and used excessive force to arrest him. The Court reviews the factual

3   background before examining the claims.

4   **A.    Factual Background**

5          In the late evening of December 13, 2019 and early morning of December 14, 2019, Dean

6   and his then girlfriend, Vanessa Ray, returned to their multi-building apartment complex after

7   attending a party. (Deposition of Dustin Dean at 52-53 (Dkt. No. 66-1).) The two were loudly

8   arguing about the appetizers served at the party. (Id.) The argument occurred in the parking lot

9   and continued as they headed up to their third-floor apartment. (Id. at 55-56.) A resident of the

10  apartment complex contacted police to report that a male and female were arguing in the parking

11  lot and that the female yelled for help. (Ex. A to the Declaration of Richard B. Jolley at 1 (Dkt.

12  No. 63).) The caller reported that no weapons were seen. (Id. at 2.) The caller then reported the

13  two individuals left the car and walked towards an unknown unit on the south side of the

14  complex. (Id. at 1.) Shortly afterwards, another individual called to report a male and female

15  arguing inside the apartment complex, but the caller provided no description and did not identify

16  any possible weapons. (Id. at 2.) The caller also reported their belief that "there has been some

17  bailbonds/bounty people searching for someone at [this] loc[ation] and police activity for these

18  same people as well in the past." (Id.)

19         About 20 minutes after the first call, Defendants Rankine and Ford arrived at the

20  apartment complex's north side. (Jolley Decl. Ex. A at 2.) Ford testified that when he arrived he

21  heard nothing, but when he walked to the southern end of the complex he heard a female voice

22  "screaming at the top of their lungs" on the south side say "'help,' 'get away from me,' things

23  like that." (Ford Dep. at 26, 28.) One of the 911 callers, who turned out to be Dean's neighbor,

24

1 came down to let the officers into the building. (Id. at 27.) In his police report, Ford wrote that he

2 "could hear things being thrown around in the apartment and a female voice yelling for someone

3 to get away from her and leave her alone." (Jolley Decl. Ex. B at 6.)

4       Rankine and Ford then walked up to the third floor to Dean's apartment. Rankine's report

5 states that upon arriving he "heard clearly the voice of a female screaming for help." (Ex. F to

6 the Declaration of Matthew A. Erickson, Sr. at 2 (Dkt. No. 66-6 at 3).) Dean testified that at the

7 time the officers arrived, he and Ray were still arguing. (Dean Dep. at 65.) According to Dean,

8 Ray's daughter told him she saw the officers at the door when she looked through the door's

9 peephole. (Dean Dep at 68.) There is some dispute about how the officers found the door to

10 Dean's apartment. According to Ford, they found the door to Dean's apartment cracked open

11 about three inches, and that either he or Rankine knocked and announced their presence. (Ford

12 Dep. at 29-30.) Rankine's report states he "checked the door handle to the apartment, and it was

13 unlocked" and that he then "knocked on the door and the door swung open." (Erickson Decl. Ex.

14 F. at 2.) Ford testified that neither he nor Rankine entered into the apartment, but they both had

15 their guns drawn in a "low ready" position, pointing at the ground. (Ford Dep. 34-35.) But

16 Rankine's police report states that they had their guns in a "modified high ready position."

17 (Erickson Decl. Ex 2.)

18       Dean headed to the door and saw Rankine in the doorway with Ford to the side and

19 slightly behind him. (Dean Dep. at 68-69.) Ford recalls seeing Dean walk towards the open door

20 from a dark interior hallway. (Ford Dep. at 32-33.) Rankine also recalls seeing Dean fully inside

21 the apartment, approximately fifteen feet from the door's threshold. (Rankine Dep. at 37.) All

22 involved agree that the officers announced their presence. (Dean Dep. at 70.) While Dean claims

23 the officers did not state why they were there (Dean Dep. at 70), Rankine and Ford testified that

24

1 | they told Dean they were there to investigate a disturbance and were going to detain Dean until

2 | they figured out what was going on (Rankine Dep. at 39; Ford Dep. at 37).

3 |      Dean walked out of his apartment and both officers could see Dean was unarmed. (Dean

4 | Dep at 69-70; Rankine Dep. at 38-39; Ford Dep. at 36.) There is a dispute as to how Dean exited

5 | the home. Dean testified that he stepped out on the landing and turned his back on the officers to

6 | close the door. (Dean at 71-72.) Rankine claims that before he exited, Dean put his hands

7 | behinds his back and without a word, ran out of the apartment towards the officers. (Rankine

8 | Dep. at 39-40.) Ford, however, testified that Dean walked at a "pretty normal, steady pace"

9 | towards the officers. (Ford Dep. at 45.) Dean testified that immediately upon exiting the officers

10 | grabbed his arms, pushed him against the wall, and attempted to place him into handcuffs saying

11 | only that he was under arrest. (Dean Dep. at 72-75.) Dean claims he did not know why he was

12 | "being detained and being attacked." (Dean Dep. at 75.) Rankine's report states that Dean was

13 | aggressive and non-compliant and that he was demanding answers as to why he was being

14 | detained. (Rankine Report at 2.) Dean testified that when the officers pushed him he "just kind of

15 | tensed up and just wasn't allowing them to throw me around" and "wasn't really doing anything

16 | besides muscle tension." (Dean Dep. at 79.) Dean did not put his hands behind his back when

17 | asked (Dean Dep. at 80), and the struggle continued. Much of the struggle is caught on video

18 | taken by Ray's daughter, who was present with her mother during the interaction.

19 |      According to Rankine, the officers wanted to move Dean away from the stairwell to

20 | minimize the chance of falling over the railing to the stairs below (about 6-8 feet). (Declaration

21 | of Timothy Rankine ¶ 9 (Dkt. No. 62).) Ford and Rankine then pulled Dean down the stairs, as

22 | Dean tried to hold onto the railing. (Dean Dep. at 84-85.) This is visible in the video exhibit.

23 | While Dean was holding onto the railing, Rankine put his arms around Dean's neck and Dean

24 |

can be heard on the video having difficulty breathing for several seconds. Although Rankine

testified in his deposition that he never put any pressure on Dean's neck (Rankine Dep. at 56, 57-

58), Defendants' expert states that based on his review of Rankine's 2022 interview concerning

the incident, "Rankine put momentary pressure on Dean's neck . . . while trying to apply the seat

belt hold, [and] he did not intentionally apply a VNR or a Choke Hold." (Report from

Defendants' Expert Jeffrey Paynter at 28 (Dkt. No. 39).) Ford testified that he saw Rankine put

his arms around Dean's neck, though he did not see what the nature of the contact was. (Ford

Dep. at 136.) And the video seems to confirm the presence of Rankine's arm around Dean's neck

and Dean's difficulty breathing. As is visible on the video, Ford is involved in the efforts to pull

Dean down the stairs, and Ford testified that he grabbed Dean's hair to pull him down. (Ford

Dep. at 65-65.)

Rankine and Ford succeeded in moving Dean down one flight of stairs and ultimately put

handcuffs on him. Rankine is seen in the video sitting on Dean's back and legs and putting

pressure on his hands, legs, and back, while Ford stands next to them occasionally putting hands

on Dean. Dean testified that at the point he was handcuffed, he "thought [he] was going to die

. . . [b]ecause [he] started seeing stars, and [his] breathing was become very hard [and his] . . .

heart was racing." (Dean Dep. at 109.) At some point during the altercation, Ford threatened to

tase Ray and her daughter who can be heard screaming and largely telling Dean to relent. (Ford.

Dep. at 37-74, 117, 119.)

After Dean was in handcuffs, Sergeant Todd Kitselman arrived on the scene because

there had been a reported use of force by the officers. (Deposition of Todd Kitselman at 46-49.)

He spoke to the officers, though not with either Ray or her daughter. (Id.) After Dean was in

handcuffs, Forded noted that Dean had blood on his lip, but Dean declined medical treatment.

1    (Ford Dep. at 78-79.) Dean has been diagnosed with PTSD. (Dean Dep. at 163-64.) Ultimately,

2    Dean was charged and booked in jail for obstruction, but not domestic violence. (Ford Dep. at

3    68, 79.)

4        In addition to the testimony and reports of Dean, Rankine, and Ford, Dean's former

5    girlfriend, Ray, has authored two competing declarations. In her first declaration from July 2020,

6    Ray stated that she and Dean had been having a purely verbal, "trivial argument" on the night in

7    question that involved no threatening behavior. (Declaration of Vanessa Ray ¶ 4 (Dkt. No. 66-

8    7).) She admits to being a loud talker, but claims she never yelled for help and was never in

9    danger. She states that she had no idea why the officers arrived, and that she observed Rankine

10   aggressively "put [Dean] in a chokehold and drag him down the stairs." (Id. ¶¶ 10, 22.) Ray also

11   stated that the officers told her and her daughter to return inside of be tased. (Id. ¶ 13.)

12   Defendants have since obtained a new declaration from Ray (now Henriquez), which contradicts

13   the earlier declaration. (Declaration of Vanessa Henriquez (Dkt. No. 69).) She now states that

14   she and Dean had been arguing and that she was terrified that Dean would crash the car in the

15   parking lot when they arrived at the apartment complex and thus began yelling for help.

16   (Henriquez Decl. ¶ 15.) Once she got into the apartment, she claims Dean yelled at her and

17   became physically violent. (Id. ¶ 16.)

18   **B.    Claims**

19       Dean's complaint contains several claims. First, he alleges the Rankine and Ford used

20   excessive force and wrongfully arrested him in violation of his First and Fourteenth Amendment

21   rights. (Complaint ¶ 5.1 (Dkt. No. 1).) Second, he alleges that the City of Tacoma is liable under

22   Monell for having unconstitutional policies that were the moving force of Rankine's and Ford's

23   conduct, which the City ratified, and that the City was deliberately indifferent. (Id. ¶¶ 5.1-5.4

24

(note duplicative use of paragraphs "5.1-5.4").) Third, Dean asserts a state law claim for assault and battery. (Id. ¶ 5.5.) Fourth, Dean asserts a claim of outrage and intentional infliction of emotional distress. (Id. ¶ 5.6.) Fifth, he asserts two "causes of action" against the City of Tacoma—that it is liable under respondeat superior and it has a duty to indemnify the officers. (Id. ¶¶ 5.7-5.8.)

## ANALYSIS

**A.    Summary Judgment Standard**

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether an issue of fact exists, the Court must view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-50 (1986). A genuine issue of material fact exists where there is sufficient evidence for a reasonable factfinder to find for the nonmoving party. Id. at 248. The moving party bears the initial burden of showing that there is no evidence which supports an element essential to the nonmovant's claim. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the movant has met this burden, the nonmoving party then must show that there is a genuine issue for trial. Anderson, 477 U.S. at 250. If the nonmoving party fails to establish the existence of a genuine issue of material fact, "the moving party is entitled to judgment as a matter of law." Celotex, 477 U.S. at 323-24.

**B.    No Fourteenth Amendment Claim**

Although Dean's Complaint references the Fourteenth Amendment, he has failed to respond to Defendants' Motions for Summary Judgment on the claim. Having failed to identify

1   and facts and no legal basis for the claim, Dean has failed to satisfy his burden. The Court

2   therefore GRANTS the Motions and enters summary judgment in Defendants' favor on this

3   claim.

4   **C.    No Federal Claims Against the City**

5       The City is correct that Dean has failed to provide any evidence or argument to sustain

6   his <u>Monell</u> claims against the City, despite having been prompted to do so by the City' Motion.

7   The City is therefore entitled to summary judgment on the claim, and the Court GRANTS the

8   Motion on this claim in the City's favor.

9   **D.    Fourth Amendment Claim**

10      The Court enters summary judgment in Defendants' favor on Dean's Fourth Amendment

11  unlawfully entry claim.

12      "It is a basic principle of Fourth Amendment law that searches and seizures inside a

13  home without a warrant are presumptively unreasonable." <u>Payton v. New York</u>, 445 U.S. 573,

14  586 (1980) (citation and quotation omitted). But "[t]he Fourth Amendment does not require

15  officers to get warrants" and instead "it requires that officers not conduct 'unreasonable searches

16  and seizures.'" <u>Mendez v. Cnty. of Los Angeles</u>, 897 F.3d 1067, 1075 (9th Cir. 2018). An officer

17  may enter a home without a warrant if there are "exigent circumstances or an emergency" so

18  long as it is reasonable. <u>Id.</u>

19      To the extent that Rankine entered Dean's home by either opening the door, knocking it

20  ajar, or standing in the doorway, his decision to do so was not unreasonable. Based on what he

21  knew from the 911 calls and his own perception, he believed that someone was in need of

22  immediate help. His brief entry into the apartment was done to investigate what appeared to be

23  an exigent circumstance that obviated the need for a warrant. And he did not lay hands on Dean

24

1  until Dean himself left his apartment. On this record, the Court finds that no facts support Dean's

2  Fourth Amendment claim. And there are no facts supporting Dean's claim that Ford made any

3  entry into the home, which is an independent reason why the claim fails against Ford.

4      The Court GRANTS summary judgment in Defendants' favor on this claim.

5  **E.    Excessive Force Claim**

6      Defendants move for summary judgment on Dean's Fourth Amendment excessive force

7  claim on the theory that the use of force was objectively reasonable. On the record presented, the

8  Court finds a dispute of fact exists as to whether the use of force was reasonable. The Court

9  therefore DENIES summary judgment on the claim.

10      **1.    Legal Standard**

11      The Fourth Amendment guarantees citizens the right "to be secure in their persons . . .

12  against unreasonable . . . seizures" of the person. U.S. Const. amend. IV. "Determining whether

13  the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a

14  careful balancing of the nature and quality of the intrusion on the individual's Fourth

15  Amendment interests against the countervailing governmental interests at stake." Graham v.

16  Connor, 490 U.S. 386, 396 (1989) (citation and quotation omitted).

17      The touchstone in evaluating an officer's use of force is objective reasonableness. See

18  Graham, 490 U.S. at 397 (citing Scott v. United States, 436 U.S. 128, 137–39 (1978)). "The

19  'reasonableness' of a particular use of force must be judged from the perspective of a reasonable

20  officer on the scene, rather than with the 20/20 vision of hindsight." Id. at 396 (citing Terry v.

21  Ohio, 392 U.S. 1, 20–22 (1968)). But the test itself is "not capable of precise definition or

22  mechanical application" and instead "requires careful attention to the facts and circumstances of

23  each particular case." Id. (citation and quotation omitted). The reasonableness standard "nearly

24

1    always requires a jury to sift through disputed factual contentions," so summary judgment in an

2    excessive-force case "should be granted sparingly." Torres v. City of Madera, 648 F.3d 1119,

3    1125 (9th Cir. 2011) (quoting Santos v. Gates, 287 F.3d 846, 853 (9th Cir. 2002)).

4        The reasonableness of the officer's conduct is assessed by balancing the "nature and

5    quality of the intrusion" on the plaintiff's Fourth Amendment rights against the government's

6    countervailing interest in the force used. Graham, 490 U.S. at 396 (quoting Tennessee v. Garner,

7    471 U.S. 1, 8 (1985)). "Standing in the shoes of the 'reasonable officer,' we then ask whether the

8    severity of force applied was balanced by the need for such force considering the totality of the

9    circumstances, including (1) the severity of the crime at issue, (2) whether the suspect posed an

10   immediate threat to the safety of the officers or others, and (3) whether the suspect was actively

11   resisting arrest or attempting to evade arrest by flight." Torres, 648 F.3d at 1124.

12       "The 'most important' Graham factor . . . [is] the level of threat [the plaintiff] posed

13   immediately before his death." Est. of Aguirre v. Cnty. of Riverside, 29 F.4th 624, 628 (9th Cir.),

14   cert. denied sub nom. Cnty. of Riverside, California v. Est. of Clemente Najera-Aguirre, 143 S.

15   Ct. 426 (2022) (quoting Mattos v. Agarano, 661 F.3d 433, 441 (9th Cir. 2011) (en banc)). We

16   also "recognize that 'police officers are often forced to make split-second judgments—in

17   circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is

18   necessary in a particular situation,' and that these judgments are sometimes informed by errors in

19   perception of the actual surrounding facts." Torres, 648 F.3d at 1124 (quoting Graham, 490 U.S.

20   at 397). When there is error in perception in judgment, we judge its reasonableness by "ask[ing]

21   whether a reasonable officer would have or should have accurately perceived that fact." Id.

22       The Court reviews the three Graham factors below.

23

24

### 2.     Severity of Crime

The crime Rankine and Ford investigated was a potentially serious domestic violence crime. The calls received suggested that someone was in need of immediate help and had repeatedly called for help. Rankine and Ford both testified that they heard cries for help when they arrived. And although Dean denies this, he admits that he and Ray were arguing. Based on what the officers knew, they believed that they were investigating a potential domestic violence argument that had someone fearful for their safety. That said, the officers did not have any specific evidence of any physical harm, see any signs of a disturbance, or see anyone other than Dean. But based on what they knew, it was not unreasonable for them to believe they were investigating a potentially serious domestic violence encounter.

In analyzing this factor, the Court rejects Dean's belief that the only crime to be analyzed is obstruction of justice—the crime for which he was ultimately charged. While Dean was charged only with obstruction, the officers arrived at his house to investigate a suspected domestic dispute, not obstruction. Dean offers no reason why the Court should analyze the officer's use of force based on the crime Dean was charged with, rather than the crime of which he was suspected at the time of the encounter. It would make little sense to consider only the crime ultimately charged, as that does not aid the Court in understanding the nature of the situation the officers faced at the outset of the encounter. The Court rejects Dean's position.

As an aside, Defendants suggest that that they only detained Dean and their use of handcuffs was permitted as part of a brief detention. (City/Ford MSJ at 11; Rankine MSJ at 8.) Defendants rely on a Washington v. Lambert, 98 F.3d 1181 (9th Cir. 1996) for this proposition. But Lambert does not support Defendants' belief that they were using handcuffs merely to detain Dean, not to arrest him. In Lambert, the Ninth Circuit explained that an investigatory stop does

1    not become an arrest "in special circumstances, such as 1) where the suspect is uncooperative or

2    takes action at the scene that raises a reasonable possibility of danger or flight; 2) where the

3    police have information that the suspect is currently armed; 3) where the stop closely follows a

4    violent crime; and 4) where the police have information that a crime that may involve violence is

5    about to occur." Id. at 1189 (citation omitted). Here, when Rankine and Ford decided to detain

6    Dean, Dean was neither uncooperative nor armed. As such, the "special circumstances"

7    identified in Lambert are not met. The officers here performed an arrest.

8        **3.    Immediacy of Risk**

9        There remains a substantial dispute of fact that cannot be resolved at summary judgment

10   as to just what level of risk Dean posed at the time the officers laid hands on him.

11       The first dispute centers on what Dean did before the officers laid hands on him. While

12   Rankine claims Dean came charging out in an angry manner, Ford testified that Dean walked

13   slowly out—a fact Dean corroborates. And according to Dean, when he exited his apartment and

14   turned his back on the officers to close his door, the officers immediately began pushing and

15   grabbing him without explanation. It is also undisputed that the officers knew Dean was unarmed

16   and that there was no sound coming from the apartment suggesting anyone was in danger. And

17   Dean was not resisting arrest or disregarding any commands at the moment the officers tried to

18   place him in handcuffs. Construing the facts in Dean's favor, he posed no threat to the officers.

19       The facts of this case are similar to those in a 2005 Ninth Circuit case, Smith v. City of

20   Hemet, 394 F.3d 689 (9th Cir. 2005). In Smith, officers were dispatched to the Smith's residence

21   to investigate a call from Smith's wife stating that Smith had physically assaulted her. Id. at 693.

22   When officers arrived, they found Smith alone outside on his porch, and he refused to remove his

23   hands from his pockets to show he was unarmed and instead asked one of the officers to come

24

1   with him inside the home. Id. Smith ultimately did show his hands to show he was unarmed, but

2   he refused to put them on his head. Id. at 694. Without further warning, an officer pepper-

3   sprayed Smith and then several officers grabbed Smith and threw him down to the ground. Id.

4   The officers not only pepper-sprayed Smith four more times, but a police canine followed orders

5   to bite Smith's body multiple times. Id. In analyzing the immediacy of the threat Smith posed,

6   the Ninth Circuit explained that although Smith was alleged to have engaged in a violent crime,

7   at the time the officers arrived, he was alone without any evidence of possessing a weapon or a

8   "threat to the safety of the officers or others." Id. at 702. And while Smith refused to comply

9   with the demands of the officers, he made no threats to the officers. Id.

10        Here, the facts align with Smith. Like Smith, Dean was not armed and neither Ford nor

11   Rankine suspected him of being armed. Construing the facts on Dean's favor (based on both

12   Dean's and Ford's testimony), he exited the apartment slowly and was trying to close the door

13   when Ford and Rankine then attempted to place him into handcuffs. Ford denies that Dean

14   charged at them or made any verbal threats. (Ford Dep. at 45-46.) At most, he believed Dean had

15   a "[b]laded stance and his chin was tucked down . . . [in] a fighting stance." (Ford Dep. at 45.)

16   Rankine maintains that Dean charged at him and was similarly aggressive. But construing the

17   disputed facts in Dean's favor, there is no evidence Dean posed a threat to the officers when they

18   laid hands on him. This strongly favors Dean's claim since the immediacy of the threat is the

19   most important factor in the Court's analysis. See Aguirre, 29 F.4th at 628.

20        The Court also rejects Defendants' insistence that the risk of falling down the stairwell

21   posed an immediate threat to the officers and Dean. The stairwell posed a risk only after the

22   officers decided to engage in a physical struggle with Dean. Had the officers not initiated the

23   struggle, the stairs posed no immediate risk. Only after the officers started to wrestle Dean did it

24

1   become a risk, and it is not properly the focus of the Court's analysis, which considers the risk

2   Dean posed at the time of first contact. See Smith, 394 F.3d at 702.

3          The Court also rejects Defendants' argument that the officers had a "mandatory duty to

4   arrest" Dean under RCW 10.31.100(2). (City/Ford MSJ at 14.) That statute mandates arrest only

5   when there is an existing court order or if: "(i) a felonious assault has occurred; (ii) an assault has

6   occurred which has resulted in bodily injury to the victim, whether the injury is observable by

7   the responding officer or not; or (iii) that any physical action has occurred which was intended to

8   cause another person reasonably to fear imminent serious bodily injury or death" RCW

9   10.31.100(2). There are no facts of an existing court order or evidence that an assault had

10  occurred or that Rankine and Ford knew of any such assault. There was no mandatory duty to

11  arrest, and this does not alter the Court's conclusion as to the immediacy of the threat.

12         **4.     Active Resistance**

13         There are two points in time to analyze the question of Dean's resistance. At the time the

14  officers decided to lay hands on Dean and arrest him, Dean was not necessarily resisting any

15  demand the officers made. That is because, according to Dean, he was never warned he was

16  going to be placed under arrest or told why. The officers never asked Dean questions about who

17  was in trouble, what might have happened, and why they were there. At the time of first contact,

18  then, Dean had no moment to resist.

19         At the same time, there is evidence that once the officers tried to arrest Dean, he was

20  resisting their efforts. Dean claims he was just using "muscle tension" not to allow the officers to

21  put him into handcuffs. But the video shows that he was putting up some resistance by holding

22  onto the railing and being verbally combative. That said, a jury might find the resistance minimal

23  and there is no evidence Dean was attempting to flee. Indeed, he told his girlfriend to call the

24

1  police while Rankine and Ford were wrestling with him—a fact that favors his position that his

2  resistance was part of his overall belief that he was being illegally assaulted.

3                              *     *     *

4        Considering the Graham factors, the Court finds that a dispute of fact precludes summary

5  judgment on this claim. Critically, Dean posed no immediate threat to the officers at the moment

6  they decided to arrest him, and their fears about the stairs causing harm was only borne out of

7  their decision to start the altercation with Dean. And while they may have been dispatched to

8  investigate calls for help, Dean posed no obvious threat, as he was unarmed and had turned his

9  back to the officers to close his door when they laid hands on him. While Dean may have put up

10 some resistance to the arrest, he did not flee. And the use of force was substantial. Both officers

11 wrestled with Dean and pulled him down a flight of stairs while applying considerable pressure

12 on his body. Rankine admits he blocked Dean's airway while both officers pulled him down the

13 stairs, and Ford participated by grabbing Dean's hair and pulling him down the stairs. A jury

14 could well find the level of force used exceeded what was appropriate and reasonable under the

15 circumstances. For these reasons, the Court DENIES summary judgment on the claim.

16 **F.     No Qualified Immunity on Excessive Force Claim**

17       The Court finds that Defendants are not entitled to qualified immunity on Dean's

18 excessive force claim.

19       **1.     Legal Standard**

20       Qualified immunity protects government officials "from liability for civil damages

21 insofar as their conduct does not violate clearly established statutory or constitutional rights of

22 which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

23 It protects government officials "unless (1) they violated a federal statutory or constitutional

24

1    right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" District of

2    Columbia v. Wesby, 583 U.S. 48, 62–63 (2018) (quoting Reichle v. Howards, 566 U.S. 658, 664

3    (2012)). The Court may address either prong first, see Pearson v. Callahan, 555 U.S. 223, 236–

4    42 (2009), and "may exercise [its] discretion to resolve a case only on the second ground when

5    no clearly established law shows that the officers' conduct was unconstitutional," O'Doan v.

6    Sanford, 991 F.3d 1027, 1036 (9th Cir. 2021).

7        A right is clearly established when it is "sufficiently clear that every reasonable official

8    would have understood that what he is doing violates that right." Reichle, 566 U.S. at 664

9    (internal quotation marks and alterations omitted). There need not be "a case directly on point, so

10   long as the "existing precedent" "place[d] the statutory or constitutional question beyond

11   debate." Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011). "Such specificity is especially important

12   in the Fourth Amendment context, where the Court has recognized that 'it is sometimes difficult

13   for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the

14   factual situation the officer confronts.'" Mullenix v. Luna, 577 U.S. 7, 12 (2015) (per curiam)

15   (alteration omitted) (quoting Saucier v. Katz, 533 U.S. 194, 205 (2001)).

16       "Cases 'cast at a high level of generality' are unlikely to establish rights with the requisite

17   specificity." Waid v. Cnty. of Lyon, 87 F.4th 383, 388 (9th Cir. 2023) (quoting Brosseau v.

18   Haugen, 543 U.S. 194, 199 (2004) (per curiam)). "While a case addressing general principles

19   may clearly establish a right in an obvious case, such obvious cases are rare." Id. (citation and

20   quotation omitted). "Instead, a clearly established right usually requires "controlling authority or

21   a robust consensus of cases of persuasive authority." Id. (quoting Wesby, 583 U.S. at 63). In

22   such cases, the plaintiff "must either explain why their case is obvious under existing general

23

24

1  principles or, more commonly, show specific cases that control or reflect a consensus of non-

2  binding authorities in similar situations." Id.

3  **2.    No Immunity**

4  At the time of the incident, the law was clearly established that officers responding to a

5  report of domestic violence do not face an immediate threat when a domestic violence suspect is

6  both unarmed and alone, even if he is uncooperative. Smith made this clear, and Dean correctly

7  relies on it as evidence of clearly established law. (Pl. Opp. at 19.) In Smith, the suspected crime

8  was reported by the victim who claimed the plaintiff had assaulted her. But, like Dean, when the

9  police arrived, the plaintiff in Smith was unarmed and alone. And, like Dean, the plaintiff in

10 Smith was not cooperative. Nevertheless, the Ninth Circuit held that the officers' use of force

11 could be found unreasonable given that there was no apparent risk to the officers. Smith clearly

12 established someone who is unarmed and alone does not pose an immediate risk even if he does

13 not comply with order and even if he is suspected of having been involved in domestic violence.

14 Dean also correctly cites to Nelson v. City of Davis, 685 F.3d 867 (9th Cir. 2012), as

15 clearly established law that cuts against the officer's use of force in this case. In Nelson, the

16 Ninth Circuit explained that it has "recognized that a failure to fully or immediately comply with

17 an officer's orders neither rises to the level of active resistance nor justifies the application of a

18 non-trivial amount of force." Id. at 881. And the Ninth Circuit cited existing caselaw finding the

19 use non-trivial force improper even where "the extent of the resistance was substantially greater"

20 than what was used in Nelson. Id. Construing the facts in Dean's favor, the use of greater than

21 non-trivial force was improper, as he was not engaged in active resistance or disobeying orders

22 when Rankine and Ford decided to grab and push him to arrest him. While Dean perhaps

23 displayed some resistance to arrest after the initial force used, that does not alter the fact that the

24

1  decision to use greater than non-trivial force at the outset was not reasonable and contravened

2  Nelson and the cases it cited.

3      The Court DENIES Defendants' request for qualified immunity.

4  **G.    Assault and Battery**

5      Dean's assault and battery claim may proceed to trial. Under Washington law, a police

6  officer can commit the tort of assault and battery when "unnecessary violence or excessive force

7  is used in accomplishing [an] arrest." Boyles v. City of Kennewick, 62 Wn. App. 174, 176

8  (1991). Given the Court's analysis of Dean's excessive force claim, the Court finds the claim

9  should proceed to trial given the disputes of fact as to the reasonableness of the force used. And,

10  as Defendants concede, the officers cannot obtain immunity under state law any more than under

11  federal law. (See City/Ford Reply at 12.) Given the Court's conclusions as to qualified

12  immunity, the Court denies the request for immunity under state law.

13      The Court also notes that because the City has conceded Dean correctly invoked

14  respondeat superior, the City remains a defendant as to this claim.

15  **H.    Outrage Claim**

16      "The tort of outrage requires the proof of three elements: (1) extreme and outrageous

17  conduct, (2) intentional or reckless infliction of emotional distress, and (3) actual result to

18  plaintiff of severe emotional distress." Kloepfel v. Bokor, 149 Wn.2d 192, 195 (2003). The

19  plaintiff "must show extreme and outrageous conduct intended to cause emotional distress to the

20  plaintiff." Id. at 202. "[A]ny claim for intentional infliction of emotional distress must be

21  predicated on behavior 'so outrageous in character, and so extreme in degree, as to go beyond all

22  possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized

23  community.'" Id. at 196 (quoting Grimsby v. Samson, 85 Wn.2d 52, 59 (quotation omitted)).

24

1    Dean has done little to explain how the conduct here satisfies the high standard for an

2    outrage claim—relegating two sentences to his opposition. (See Resp. at 26.) The Court has not

3    been provided with sufficient argument and evidence to identify how the conduct at issue here

4    goes "beyond all possible bounds of decency, and to be regarded as atrocious." Kloepfel, 149

5    Wn.2d at 196. Even if there were such evidence, Dean has failed to provide evidence cited that

6    shows that Rankine or Ford intended to cause him emotional distress. This is a second fatal flaw

7    to the claim that warrants summary judgment in Defendant's favor. The Court GRANTS

8    summary judgment on this claim in Defendants' favor.

9    **I.    Motion to Strike**

10    Dean asks the Court to strike a declaration from a 911 operator, Tifni Buchanan, who he

11    claims was not disclosed as a witness. The Court agrees in part. Buchanan was not disclosed as a

12    witness, but she does fall in a category of witnesses who can authenticate documents. For that

13    reason, she may authenticate the 911 call records. But the Court agrees with Dean that her

14    substantive declaration may not be considered, as it does far more than authenticate the records.

15    On these grounds, the Court STRIKES the substance of Buchanan's declaration aside from her

16    authentication of the 911 report.

17    **CONCLUSION**

18    The Court DENIES the Motions for Summary Judgment as to Dean's Fourth Amendment

19    excessive force and the assault/battery claims. A jury must resolve the disputed facts that are

20    material to these claims. Dean's excessive force and assault/battery claims may proceed to trial

21    against the officers, and the City shall remain a defendant given its respondeat superior liability

22    on the state law claim. The Court otherwise GRANTS summary judgment in Defendants' favor

23    on all other claims. And it STRIKES, in part, the Buchanan declaration.

24

The clerk is ordered to provide copies of this order to all counsel.

Dated April 21, 2025.

Marsha J. Pechman
United States Senior District Judge